ANNETTE KINGSLAND ZIEGLER, J.
¶ 1. This is a review of an unpublished decision of the court of appeals, State v. Lopez, No. 2011AP2733-CR, unpublished slip op. (Wis. Ct. App. Sept. 26, 2012), reversing the Dane County Circuit Court's[1] denial of Minerva Lopez's ("Lopez") presentence motion to withdraw her pleas.
¶ 2. We address how appellate courts should review a circuit court's denial of a defendant's motion to withdraw a plea before sentencing. In general "a circuit court should 'freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reason, unless the prosecution [would] be substantially prejudiced. State v. Jenkins, 2007 WI 96, ¶ 2, 303 Wis. 2d 157, 736 N.W.2d 24 (citing State v. Bollig, 2000 WI 6, ¶ 28, 232 Wis. 2d 561, 605 N.W.2d 199; see also State v. Rushing, 2007 WI App 227, 305 Wis. 2d 739, 740 N.W.2d 894).
¶ 3. The State does not argue that Lopez failed to present a fair and just reason to withdraw her pleas.[2] Thus, our analysis in this case focuses on whether the *5 circuit court erroneously exercised its discretion in concluding that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.
¶ 4. Lopez contends that the State has not shown that it would be substantially prejudiced if she were allowed to withdraw her pleas. She argues that the State offered no evidence that the victim is unable to testify or that the victim's memory has faded. Lopez further asserts that the State failed to demonstrate that the case against Lopez would be more difficult to prove, and that, in fact, significant evidence against Lopez could still be admitted at trial.
¶ 5. The State contends that the circuit court properly exercised its discretion in determining that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. The State argues that, because the victim is now over 16 years of age, allowing Lopez to withdraw her pleas would prevent it from presenting important audiovisual interviews of the victim at trial. The State asserts that the circuit court was correct to conclude that the State would be substantially prejudiced because, without the audiovisual evidence, it would be more difficult for the State to prove its case, the victim's memory had faded during the pendency of the action, and it was in the best interests of the victim not to be forced to testify.
¶ 6. We hold that the circuit court did not erroneously exercise its discretion when it determined that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. We sustain the discretionary determination of the circuit court because the record reflects that it was "the product of a rational mental process by which the facts of record and law *6 relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." State v. Canedy, 161 Wis. 2d 565, 580, 469 N.W.2d 163 (1991) (citations omitted). Accordingly, we reverse the court of appeals.
I. FACTUAL ALLEGATIONS
¶ 7. In a trial against Lopez, the State would have to prove 22 felony counts of physical abuse of a child. The State's burden of proof is the highest standard in the law, beyond a reasonable doubt. The record reflects that the State would have sought to prove the facts alleged in the criminal complaint in part, by using audiovisual interviews of the victim. The State contends that it would be substantially prejudiced if Lopez were allowed to withdraw her pleas because it is now precluded from introducing video evidence under Wis. Stat. § 908.08(3) (2009-10)[3] as the victim is now over 16 years of age. Thus, we turn to the factual basis for the allegations against Lopez and describe the audiovisual recordings at issue in this case.
¶ 8. On September 25, 2008, Madison Police Detective Robert Hale ("Detective Hale") was "dispatched to [an address] in the Town of Madison, Dane County, Wisconsin, in reference to a child abuse investigation." Detective Hale was sent to investigate a report of "an emaciated female child in the closet. . . [with] some type of injury to her head." Upon arrival, Detective Hale identified A.O., the primary victim in this case. Detective Hale described the injuries to A.O. as follows:
*7 [Hale] immediately identified [A.O.][4] as a victim of a horrendous crime inasmuch as she was virtually covered from head to toe with bruises [and] with various bloody wounds to the top scalp of her head, an open gash to her right cheek, various generations of bruises ranging in color from purple to green to yellow, and injuries that were consistent with what [Hale] later found were breaks in her right hand and a broken right kneecap.
Detective Hale identified two suspects in the case, Lopez and Porfirio Olivas-Lopez ("Olivas"), the victim's parents.
¶ 9. After rescuing A.O. from her home, Detective Hale transported her to the University of Wisconsin Children's Hospital. Upon examination, A.O. was found to have "two breaks to the fingers of her right hand, one of which was an older break, the second of which was a newer break." A.O.'s broken right kneecap "was going to need surgical treatment."
¶ 10. A child abuse specialist concluded that "the multiple bruises and fractures present [on A.O.] are not consistent with any medical cause." The specialist also noted that A.O. "appeared malnourished," and was "potentially going to be suffering from life-long disabilities due to injuries sustained from the abuse, including but not limited to scarring resulting in permanent disfigurement and injuries leading to limb immobility." The specialist medically diagnosed A.O. with:
1. Definite physical abuse of a child.
2. Serial child torture.
3. Physical neglect of a child.
4. Medical neglect of a child.
*8 5. Educational neglect of a child.
6. Consistent with causation of great mental harm.
¶ 11. On September 26, 2008, Detective Hale spoke with Lopez at the Town of Madison Police Department. During the discussion, which was conducted through the assistance of a State-certified English-Spanish interpreter, "Lopez admitted to causing the majority of the injuries sustained by [A.O.] and observed by Detective Hale." Lopez admitted to having "hit [A.O.] on the head with a [broomstick]." "The broom was described as a metal broom, and it was bent from the attack."
¶ 12. The criminal complaint, filed October 2, 2008, relates that Detective Hale elicited further admissions from Lopez during the interview:
When asked how often she would hurt [A.O.], [Lopez] said she would [use] Defendant Olivas' belt. She said that she used the belt on [A.O.'s] buttocks area. When asked if she ever punched [A.O.] with a fist, she said yes, and also said that she would slap [A.O.]. Detective Hale asked if [she] had ever bitten [A.O.] as [A.O.] looked like she had some bite marks on the inside of her legs. Lopez said that she did not bite her on the inside of her leg, and when asked where she did bite her, Lopez pointed to the right side of her face by the jaw line and said "Here." ...
Detective Hale asked her what the worst thing she had done to [A.O.] was, she responded by saying "Well, hitting her on the head." When asked if it was when she hit her on the head with the metal broom or other times, Lopez responded there were other times. When asked specifically what she used to strike [A.O.] on the head with, she said she once had used "a frying pan."
Lopez admitted that police would be able to identify the frying pan she had used to strike A.O. because "it got *9 kind of dented on the bottom." When Detective Hale asked her how many times she had struck A.O. on the head, Lopez replied, "[l]ately it has been quite often."
¶ 13. Lopez also admitted to Detective Hale that she had poured hot water on A.O., and stated " '[y]eah, it was hot from being on the stove and we were both in the kitchen and she wasn't hurrying enough.'" Lopez continued by saying that she would " 'lose it' and have this 'stupid reaction,' saying T threw it on her clothes' with [A.O.] responding 'You're burning me, you're burning me.'"
¶ 14. Detective Hale also asked if Lopez had ever cut A.O. with a knife. Lopez said that, in fact, "she had used a knife to cut [A.O.] with.. .. When asked if [A.O.] screamed, she said yes. When asked if there was a lot of blood, she said Yes.'"
¶ 15. When asked what other ways she abused A.O., Lopez admitted to strangling her. "[Lopez] said 'Be quiet, be quiet or I'll make you be quiet.' At that point, she would press down on [A.O.'s] neck .... Lopez said that she would leave red marks on [A.O.'s] neck and that those would go away and then bruises would come later." Lopez noted that A.O. would try to defend herself, but" '[t]hat would make me angrier and I would just say to her, you're not going to beat me.'"
¶ 16. On October 6, 2008, and again on October 16, 2008, A.O. gave statements about her abuse in the form of recorded audiovisual interviews.[5] In these audiovisual recordings, A.O. recounts detailed descriptions of the abuse. The circuit court reviewed the audiovisual recordings as part of its determination of *10 whether the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.
¶ 17. In the audiovisual recordings, A.O. related how Lopez hit her on the knee "with a metal baseball bat" on the day that she was rescued.[6] A.O. gestured to her fully braced and immobilized right leg while she said "it hurt a lot" and that she was barely able to walk. Subsequent medical diagnosis revealed that her kneecap had been broken.
¶ 18. A.O. described that, three days before the attack with the bat, Lopez hit her twice in the back of the head with a piece of metal tube from a scooter, tearing her scalp. A.O. pointed to the location of the injury to her scalp and described that she was "bleeding a lot" and that she had to clean her own bloodstains out of the carpet. A.O. then described a "piece of flesh" detaching from her scalp while in the bath and being able to "feel a hole" in the back of her head. A.O. also related that Lopez refused to seek medical attention for A.O.'s injuries.
¶ 19. About "three weeks" before the interviews, A.O. further described seeing that Lopez "had something behind her back," so she knew that Lopez "had something to hit me with." Lopez hit her in the face with the metal bar from a drawer, causing what A.O. described as a "hole" underneath her eye. A.O. pointed to the dark circle under her eye. A.O. said that Lopez forced her to wear "dark glasses and [her] hat" in public to conceal the injury.
¶ 20. A.O. also described an attack, which occurred approximately four weeks before the interviews, where Lopez choked A.O. for accidentally dropping *11 pizza on the floor during dinner. A.O. lost consciousness and "peed her pants." According to A.O., Lopez stopped the attack because she feared that the "pigs would be here any minute." A.O. was then forced to "stand in the corner [of her parents' bedroom] for the whole night." As A.O. began to fall asleep, Olivas threw ice water on her face.
¶ 21. A.O. described "being careful to make sure teachers didn't see the bandages" as she pointed to scars on her wrists from Lopez cutting her with a kitchen knife. She recalled that Lopez cut her so deep "it opened me up [to where] I could see white, and I said 'it's my bone.'" A.O. recalled that Lopez would "sometimes throw the knife at me." Lifting up her shirt, A.O. showed scars left when the knife hit her.
¶ 22. A.O. related that if Lopez noticed "that the frying pan had a little speck of beans on it" after A.O. did the dishes, Lopez would hit her on the head with the pan. This abuse occurred "about five times." Because of being struck in this way, the handle of one pan broke off, while another became "bent." A.O. described that these beatings caused her "a lot of pain, and [she] felt like something burst."
¶ 23. A.O. described an instance when she was crying as a result of the repeated beatings and Lopez "bit her on the face" in an effort to get her to "shut up before someone hears." Lopez left "teeth mark bruises" on A.O.'s skin.
II. PROCEDURAL HISTORY
¶ 24. On October 2, 2008, the State filed a criminal complaint against Lopez, and she made her initial appearance with counsel. Lopez's bail was initially set *12 at $25,000 cash. The criminal complaint, which also served as the factual basis for Lopez's eventual pleas, alleged 27 separate counts against Lopez and Olivas for the physical abuse A.O. suffered. The complaint included 25 counts of intentionally causing bodily harm to a child, contrary to Wis. Stat. § 948.03(2)(b) (2007-08), a class H felony, and two counts of intentionally causing great bodily harm to a child, contrary to § 948.03(2)(a) (2007-08), a class C felony. Lopez was charged with 16 of the 27 counts, including both counts of causing great bodily harm.
¶ 25. On October 8, 2008, the State notified Lopez of its intent to use the October 6 audiovisual recording of A.O. at trial under Wis. Stat. § 908.08.[7] The notice came just six days after Lopez's initial appearance and two days after the interview was recorded. At the time A.O. was 14 years old. The State filed a similar notice relating to the October 16, 2008 audiovisual recording on July 3, 2009.
¶ 26. On October 9, 2008, Lopez, represented by a different attorney, waived her right to a preliminary hearing and was bound over for trial. On November 3, 2008, Lopez was arraigned on the Information, which charged Lopez and Olivas with 49 counts of felony child *13 abuse. Lopez entered pleas of not guilty and not guilty by reason of mental disease or defect. On December 1, 2008, an Amended Information was filed, which added penalty enhancers to certain counts for use of a dangerous weapon.
¶ 27. On December 4, 2008, the State and Lopez filed a "Stipulation and Agreement Regarding Audiovisual Recording." The agreement acknowledged that "the State has provided the defense with a copy of an audiovisual recording of a child." The parties agreed that "neither party will make additional copies of the videotaped statement, nor will either party allow additional copies to be made by any other entity or individual."
¶ 28. On January 27, 2009, Lopez's attorney filed a motion to withdraw from representation. In the motion, counsel stated that he was seeking to withdraw at the request of Lopez. On January 29,2009, the court granted the motion to withdraw. On February 6, 2009, the State Public Defender appointed a new attorney for Lopez.
¶ 29. On March 23, 2009, the court held a status conference in the case. The court set a trial date of July 14, 2009.
¶ 30. On April 10, 2009, Lopez's attorney filed a motion to withdraw from representation because Lopez "no longer wants me to represent her." The court granted the motion to withdraw the same day.
¶ 31. On June 19, 2009, Lopez, now represented by a third attorney, filed a motion to sever her trial from Olivas'. On June 23, 2009, the court held a hearing and granted Lopez's motion to sever, concluding that there was a possibility that Lopez and Olivas would pursue "mutually antagonistic" defenses. After granting Lopez's *14 motion, the court kept the July 14 trial date for Olivas,[8] but did not set a trial date for Lopez due to a pending plea offer.
¶ 32. On July 22, 2009, Lopez's third attorney filed a motion to withdraw as Lopez's counsel. Counsel noted that Lopez had written to both the public defender's office and to the court requesting new appointed counsel. Counsel argued that "[t]his matter currently has no dates scheduled for trial and neither Ms. Lopez nor the state will be prejudiced by any delay in appointment of new counsel."
¶ 33. On July 31, 2009, the court[9] held a hearing on the motion to withdraw and stated:
There is nothing in the law that says the defendant has to like her attorney. What the defendant is entitled to under the law is effective representation and counsel who is diligent in pursuing in this case his obligations as it relates to Ms. Lopez.
You, [Counsel], are the third attorney who's been on this case. As I listened to Ms. Lopez's comments, half of her comments had to do with her background and her upbringing and had nothing to do with whether or not she could get along with you for purposes of representation.
¶ 34. At the motion hearing, the State referenced the need to timely proceed. Indeed, the court referenced the potential prejudice to the State if the trial did not occur before A.O. turned 16 years old:
The State has made reference to the potential prejudice that it runs into in this matter. I realize May of next year is still ten months away. But, at that point in time, the alleged victim in this matter would be turning *15 sixteen, which would impact on the use of the Safe Harbor tapes. Also, we are talking here about a child who was fourteen when these events allegedly occurred, which means this case has been pending over and hanging over the head of this child for a substantial period of time.
The court then evaluated Lopez's arguments and indicated it was unwilling to allow counsel to withdraw and delay the matter further:
I don't see the delay here being for really any legitimate purpose. ...
I don't see that there's been an argument presented here that allows me to say that counsel has done anything other than act professionally in this matter. The fact that Ms. Lopez may not like what she hears is not counsel's fault.
I don't find any basis here to allow counsel to withdraw, and I'm going to deny the motion.
¶ 35. On August 13, 2009, the court held a scheduling conference. Lopez's trial was set for December 15, 2009, with a motion hearing to be held in September.
¶ 36. On September 18, 2009, the court heard various motions, including the State's motion to admit the audiovisual recordings of A.O. at trial. Prior to the court's ruling, Lopez's attorney briefly asked how the State planned to use the recordings:
[DEFENSE COUNSEL:] Is it their intention to try to use those instead of live testimony?
THE COURT: No. I don't think the law allows that.
[THE STATE:] No. We use — We use the tapes in conjunction with live testimony.
*16 THE COURT: That's what I said. I don't think the law allows that. At preliminary hearing —
[THE STATE:] Yes.
THE COURT: But not for purposes of the trial.
[THE STATE:] No. The witness will be on the stand and we'll play it.
[DEFENSE COUNSEL:] Then I guess to the extent that it would be a prior consistent statement, if there is those kind of challenges to the testimony, I think it would be appropriate under that theory. But, I just don't understand what they're going to gain out of it, if the witnesses are going to show up in court and testify as one would expect.
¶ 37. The court immediately clarified, however, that it was addressing the State's motion to admit the audiovisual recordings under Wis. Stat. § 908.08, and not as a prior consistent statement:
We're talking here about audio visual recordings of a statement of a child coming in under 908.08 of the statutes.
More specifically, the statute indicates under the law that in this particular case, the audio visual statement can be used before the child's 16th birthday and if the interests of justice warrant its admission under subsection (4) of the statutes.[10]
[A.O.] is fifteen now, I believe. So, she meets the first criteria.
*17 ¶ 38. The court then granted the State's motion and deemed the audiovisual statements admissible, citing to the statutory factors of Wis. Stat. § 908.08(4):
*18 If you look at subsection (4), it indicates that in determining whether the interests of justice warrant the admission of an audio visual recording of a statement of a child who is at least 12 years of age but younger than 16 years of age, there are various factors the Court looks at. The child's chronological age, the level of development, capacity to comprehend the significance of the events and to verbalize about them.
I've viewed the video tapes, as I've indicated, in this matter. Although the child does have the capacity to verbalize about them, my sense of recollection from looking at those tapes was that she was, first of all, more comfortable talking in Spanish than she was in English regarding these. She certainly has chronological age and level of development, capacity to understand the significance of the events.
She seemed to be, despite the allegations that were put forth by the State and as a result of what I saw on the tape, physically and mentally healthy enough to testify both in person and as was presented on the tape, particularly since she's now been living in a different environment.
The events about which this child's statement is made certainly constitute, assuming she is believed, the criminal or antisocial conduct perpetrated against the child. And that [A.O.] had a close emotional relationship with the defendant in this matter. And the conduct constitutes a battery at a minimum, and the allegations clearly are physical abuse. And its duration and the extent of that are set forth in the tape.
I think that it's also fairly clear here that the child's emotional relationship to those involved in the underlying proceeding were set forth in the tape. Her behavior or reaction to the previous events that occurred to her were all set forth in the tape.
There are other considerations set forth in the statute that I did take into account as well. The child's *19 behavior, attitude, demeanor during the course of the interview I took into account. How the child responded to various questions. And when I say how, I don't mean the substance of the answers other than that they were related to the questions that were asked but whether or not she seemed hysterical or straightforward in her presentation, things of that type. Whether or not she evinced any signs of fear, guilt, anxiety, stress and so forth.
I found the tapes to be pretty much straightforward. They were interviewed. The person conducting the interview attempted to put [A.O.] at ease as much as possible. Explained the purpose of the proceedings. [A.O.] clearly understood the difference between truth and lying. She will be testifying as well in this matter.
I believe that under the considerations that the Court needs to look at, that allowing the audio visual tapes to he introduced is appropriate. However, [A.O.] would need to testify first. And I believe these tapes then come in under 908.01 sub (4)(a)2, which provides that a prior consistent statement of a witness is not hearsay if the declarant testifies at trial and is subject to cross-examination; the statement is consistent with the declarant's testimony, which I assume it will be; and the statement is offered to rebut any express or implied charge against the declarant of a fabrication or improper influence or motive.
In addition to being allowed by statute, there is case law that allows the tapes to he used in that regard. I would simply note to the parties that one of the more recent cases was Ansani vs. Cascade Mountain, Inc., at 223 Wis. 2d 39. That's a 1998 case.
The videotape also, as I've indicated, clearly shows the understanding on the part of the child regarding the importance of telling the truth and that the content, circumstances of the statement contained within the tape on their face provide an indicia of trustworthiness. So, I'll allow the videotape to come in.
*20 ¶ 39. On November 19, 2009, Lopez pled no contest to six of the 22 counts against her.[11] The remaining counts were dismissed but read in pursuant to her plea agreement. The court accepted Lopez's pleas and ordered a presentence investigation report ("PSI").
¶ 40. On December 2, 2009, both Lopez and A.O. testified against Olivas at his trial.[12] The State presented the audiovisual recordings of A.O. as evidence against Olivas. On December 4, the jury returned a guilty verdict against Olivas on 21 counts and found him not guilty on three.
¶ 41. On March 9, 2010, the PSI for Lopez's sentence was filed with the circuit court. The PSI recommended a maximum term of 37 years imprisonment with between 22 and 25 years of initial confinement to be followed by 12 years of extended supervision. Further, the PSI described an "Anticipated Supervision Plan" that would preclude Lopez from having contact with any of her five children.
¶ 42. On March 18, 2010, Olivas was sentenced to 57 years imprisonment, with 20 years of initial confinement to be followed by 37 years of extended supervision.
¶ 43. On March 19, 2010, Lopez moved the court pro se to withdraw her pleas. On March 22, Lopez's third attorney petitioned the court a second time to be allowed to withdraw as Lopez's counsel. This time *21 counsel argued that, because he had advised Lopez to accept her plea agreement, her motion to withdraw her pleas placed her "in a posture essentially adversarial to counsel."
¶ 44. On March 23, 2010, the court held a hearing on Lopez's pro se motion to withdraw her pleas. The court addressed the standard to be applied to Lopez's motion:
I have concluded based on our discussion here on the record, and my review of the case law, that we will have to have a specific hearing to give the defendant an opportunity to present evidence in support of her motion to withdraw. If she doesn't present evidence supporting that, it would essentially have to be denied outright. If she has evidence, then the burden shifts back to the State I think on whether or not the State is prejudiced. And if the State presents evidence of prejudice to them as a result of the plea that was entered and now asked to be withdrawn, then Ms. Lopez would have to produce evidence rebutting the prejudice, or the alleged prejudice. And I think necessarily given the substance of what Ms. Lopez is apparently alleging in her filing just recently, it may well be that [Counsel] would have to be a witness. So we're going to do this in steps.
The court then addressed Lopez's attorney's petition to withdraw as counsel:
I think I have to grant — I will grant [Counsel's] motion to withdraw as counsel. We're going to have a status conference on April 6th, which was the date that we had scheduled for the sentencing hearing. That will be a status conference hopefully with new counsel for Ms. Lopez.
¶ 45. On April 6, 2010, the court held a status conference. Lopez was represented by her fourth ap *22 pointed attorney. Counsel requested 30 days to prepare to argue Lopez's motion to withdraw her pleas. The court agreed and scheduled a hearing for May 4, 2010.
¶ 46. On May 4, 2010, the court held the hearing on Lopez's motion to withdraw her pleas. At the outset, counsel requested that he be allowed to withdraw as Lopez's attorney because she had expressed that "she doesn't want me to proceed on this case." The court considered the significant delay, denied counsel's request, and stated:
This is clearly at this point reaching absurdity and obvious delaying and obstruction. [Counsel's] retention is limited. The question, the only question that we're addressing today is the motion to withdraw Ms. Lopez[1] pleas. And if she has a fair and just reason to withdraw those pleas, then the burden will shift to the State to prove whether they would be substantially prejudiced by allowing her to withdraw the pleas. There’s no reason why counsel and the defendant shouldn't be ready for this hearing today. The Court granted them exactly the time that they requested to be ready for this. Again, it's a very limited inquiry right now and I'm not about to allow Ms. Lopez to dismiss her fourth attorney and try to have a fifth one appointed. Not at this stage, not at this time, and not for the reasons cited, not any of those are adequate by either counsel or Ms. Lopez. So the motion to withdraw is denied.
¶ 47. The court then addressed Lopez's motion to withdraw her pleas and heard testimony from Lopez and her former attorney concerning the circumstances of Lopez's plea agreement.[13] On May 11, 2010, Lopez's attorney filed a formal motion to withdraw her pleas.
*23 ¶ 48. On May 18, 2010, the court reconvened the continued motion hearing to determine if Lopez knowingly, intelligently, and voluntarily pled, and if so, whether she should be allowed to withdraw her pleas. The State introduced Lopez's plea questionnaire and waiver into evidence. The State also called Detective Hale to testify with respect to the substantial prejudice the State would face should Lopez be allowed to withdraw her pleas:
DIRECT EXAMINATION BY [THE STATE]:
Q Good afternoon, Detective.
A Good afternoon.
Q Please state and spell your name for the record.
A It's Robert J. Hale, H-a-l-e.
Q Detective Hale, what is your occupation?
A I'm a detective for the Town of Madison Police Department.
Q What is your connection to this case?
A I was the lead detective investigating the crime.
Q Did you interact with the victim in this case?
A Yes, on numerous occasions.
Q Or more specifically the victim [A.O.]?
A That's correct, yes.
Q When did you first meet her?
*24 A I met her on the initial call back in, I believe '08, October, I think of '08. It was in '08 when the case was reported.
Q I think it was September.
A September, sorry.
Q How did you find her at that time, in what condition?
A I won't forget that. I found her coming out of a bathroom, trying to coax her out of the bathroom and saw her in a horrible, horrible condition. She was emaciated, weak, full of blood. She was just — she was just a mess. I likened her to a, dare I say, Holocaust victim, just completely beaten up and fragile.
Q Sometime after that [A.O.] was interviewed at Safe Harbor; is that correct?
A Yes, that's correct.
Q Do you recall how long after you first met her that interview took place?
A I don't recall exactly. I'm surmising about two weeks.
Q And how did she — well, tell us please about that interview process and what happened there?
[DEFENSE COUNSEL:] Your Honor, I'm going to object. I think we're getting far away from the focus of this motion.
[THE STATE:] Actually —
[DEFENSE COUNSEL:] We — it's an attempt to re-try the case, or try the case I should say.
¶ 49. The court clearly considered the substantial prejudice prong of the analysis, and stated:
*25 THE COURT: Well, the State does have the burden to establish substantial prejudice. I would assume that that's what this testimony is going to. I'm not sure it's — I mean, for the record as I mentioned at our last hearing I have actually viewed the Safe Harbor tapes. I've read the transcripts as I was viewing them. So in terms of content goes I do agree with [Counsel] that I'm not sure all of that's really necessary.
[THE STATE:] That being the case, Judge, I would ask then, Judge, that you take judicial notice of the fact that the Safe Harbor tape was used in evidence at [Porfirio] Olivas' trial, that a recorded copy is part of the record in this case along with a transcript, and that as you indicated that you have reviewed both.
THE COURT: Okay. Any objection to me taking judicial notice of those items, particularly the transcript, which is really the best documentary piece of evidence we have, of what I actually viewed and read?
[DEFENSE COUNSEL:] No, sir.
THE COURT: Okay. I will take judicial notice of that and for purpose of this hearing the tape and the transcript of the Safe Harbor tape are part of this record.
¶ 50. After hearing the evidence and testimony, the court briefly recessed and then reconvened to hear argument from counsel:
We're going to go back on the record. And I'm prepared to hear summary arguments now from counsel. I'm still — as I said at the last hearing I'm still viewing this as essentially three separate issues. The first is whether the plea by Ms. Lopez was entered knowingly, intelligently and voluntarily. The second is whether she has a fair or just reason to withdraw her plea. And the third would be considering whether the State has proven substantial prejudice if she were to be allowed to withdraw her plea.
*26 ¶ 51. Lopez's counsel first argued that Lopez's pleas were deficient. Next, he argued that Lopez's desire to put on a mental disorder defense, which she claimed was never addressed by her prior attorneys, constituted a fair and just reason for withdrawal of her pleas. Finally, counsel argued the subject of this appeal —whether the State showed substantial prejudice:
[DEFENSE COUNSEL:] And as far as a substantial prejudice to the State, they have tapes on most of this evidence. They've been through this evidence once, that makes it the second time even easier. So the prejudice to the State I think is minimal. All present — all witnesses are available. There are transcripts, as I said videotape testimony, so the argument that this would be an undo [sic] burden to re-try — or to try this case, I think that evidence doesn't hold up. That argument doesn't hold up.
THE COURT: And do you acknowledge that under Section 908.08(3) that the State would not be allowed to use the Safe Harbor tapes at trial in this case?
[DEFENSE COUNSEL:] Because of the age?
THE COURT: Yes.
[DEFENSE COUNSEL:] I believe that would be the case.
¶ 52. The State then argued against Lopez's plea withdrawal. The State first contended that Lopez's pleas were entered knowingly, intelligently, and voluntary. The State then asserted that Lopez had presented no fair and just reason for her plea withdrawal. Rather, the State argued that Lopez merely "desire[d] to have a trial," which is insufficient under Wisconsin law. Finally, the State addressed how it would be substantially prejudiced by Lopez's plea withdrawal:
*27 If in the alternative the Court were to find that Ms. Lopez has shown a fair and just reason to withdraw her plea, there is the next prong of analysis. The burden shifts to the State to show that the State would be substantially prejudiced by allowing the withdrawal of this plea. And the seminóle [sic] case on the matter is State v. Bollig, I gave the citation earlier, that says that's the case and if Ms. Lopez were able to withdraw her plea the State would indeed be substantially prejudiced because central to this trial and central to the evidence in this case are the video recorded statements taken by detectives at Safe Harbor of [A.O.], the principal victim, though not the only victim in these charges, the principal victim in these charges.
She was 14 years old at the time that she was found. She was interviewed days after she was rescued and the video recordings are now close to 20 months old. She was a child witness. And those video recordings are precluded from being admitted because she turned 16 a few days ago. Those video recordings are the most accurate testimony available of what happened of her view at that point in time. Over the nearly two years that have elapsed, or to be more accurate, 20 months that have elapsed since the recordings were made, memories do fade. Those recordings include the description of incidents that took place close to six months in some cases even before the recordings were made as the information alleges that some of this conduct was alleged to have taken place as early as April of 2008, so the incidents occurred as early as in some cases as two years ago.
Not only the issue of accuracy and accurate reflection of memory that is preserved in those tapes, but also those tapes are demonstrative of [A.O.'s] state, her physical state and her emotional state at the time that they were made. Her demeanor, which is essential to credibility determination, which is an essential function of course of a jury, or trier of fact, are lost if we *28 cannot present those recordings. In those recordings she looks like a terribly abused child that she was. Fortunately for her now, she's doing very well and looks great and that's not the same presentation that would be made at trial at this point in time. It wouldn't accurately reflect how she appeared at the time and that is a substantial prejudice that the State would suffer.
¶ 53. Having heard argument from both parties, the court ruled on the motion. First, the court concluded that Lopez's pleas were entered knowingly, intelligently, and voluntarily. The court then addressed whether Lopez had presented a fair and just reason to withdraw her pleas. The court expressed concern about Lopez's conduct, but in the end concluded that Lopez had shown a fair and just reason to withdraw her pleas:
I'm confused on the record, I'm confused on this case generally as to whether at times Ms. Lopez misunderstands the proceedings or completely understands them and is using the process and the claim of misunderstanding to delay and frustrate the basic administration of justice here. She certainly did not expeditiously seek to withdraw her plea. She waited until the trial and conviction and sentencing of her husband. She waited until approximately ten days after the Court received the presentence investigation report with a recommendation for a sentence by the Department of Corrections. .. .
Again, I think that's a really close call. I think kind of taking all of the circumstances together, the real language issues that Ms. Lopez obviously is dealing with and all of the other factors that are on the record, I think she probably has met that burden of proof and that she has proven by preponderance of the evidence a fair and just reason for me to allow her to withdraw her plea.
*29 ¶ 54. The court then concluded, however, that allowing Lopez to withdraw her pleas would substantially prejudice the State:
But as in the Bollig case and many of the others, that conclusion does not end the [inquiries] as to whether the plea withdrawal should be granted. It then becomes the State's burden to prove that allowing the defendant to withdraw her plea would result in substantial prejudice to the State. The Bollig case is directly on point for that as well as a case called State v. Rushing, which is 305 Wis. 2d 739. It's a Court of Appeals case. The Rushing case also involved accusations of injuries to child, in this case it was, in the case of the Rushing that case it was a sexual assault and the defendant frequently changed his lawyers [sic]. The defendant changed his pleas at different times or attempted to and there was a videotape that was subject of the evidence against the defendant and was one of the reasons cited by the trial court and the Court of Appeals as to why the State had shown substantial prejudice. In other words that they would be in that case not be allowed to use the tape.
In this case the Safe Harbor tapes taken of the victim [A.O.] are lengthy. If I remember correctly they're about three-and-a-half hours long. They are compelling. The testimony in the tape is credible. It's recent to when the events occurred. The testimony is specific. Clear. The age of the victim as reflected in the tapes is significant. And today if she was forced to testify of the passage of time from when the events occurred is significant here. I think this is an absolutely clear and easy call on my part to find that if the State was not allowed to use the Safe Harbor tapes it would result in substantial prejudice to the State.
I have to believe that part of [A.O.'s] therapy and recovery from everything that happened to her has included a need to forget somewhat, to move on, to *30 move forward, to try to make the best of the future life in an attempt to overcome the harm that was done to her. If she is indeed successful in her recovery and therapy, then hopefully some of the things she's already forgotten. I hope for her sake that's the case. But because I think there's a real risk that she has, in fact, again just given the passage of time and the clarity and specificity of her testimony there's no way that she could ever be expected to reproduce the testimony she gave in the Safe Harbor tapes and she shouldn't be forced to, and so like the finding by the trial court in the Bollig case and the Rushing case that I referred to, because the State would face substantial prejudice to not be allowed to use the Safe Harbor tapes, the defendant's motion to withdraw her plea is denied.
¶ 55. On June 1, 2010, the court sentenced Lopez to 30 years imprisonment, comprised of 20 years of initial confinement to be followed by 10 years of extended supervision. Lopez moved for postconviction relief on September 1, 2011, and the court denied her motion on November 16, 2011. Lopez appealed.
¶ 56. A divided panel of the court of appeals summarily reversed in an unpublished opinion and order. Lopez, No. 2011AP2733-CR, unpublished slip op. at 2. The court of appeals agreed with the circuit court that Lopez had shown a fair and just reason to withdraw her pleas, but it held that that State would not be substantially prejudiced. Id. at 3. The court of appeals concluded that the circuit court had erroneously exercised discretion in denying Lopez's motion to withdraw her pleas. Id.
¶ 57. The court of appeals reasoned that the age limit in Wis. Stat. § 908.08(3)(a) is a legislative determination and, therefore, the limit cannot be prejudicial to the State. Id. at 4-5. The court of appeals also held that any assertion of faded memory on the part of A.O. *31 was purely speculative and, therefore, the State did not meet its burden to show prejudice. Id. at 6. Finally, the court appeals concluded that the State was not substantially prejudiced because it could still use the video portion of the audiovisual recordings to show A.O.'s physical condition. Id.
¶ 58. Judge Paul Lundsten dissented. Id. at 7. He concluded that the circuit court properly exercised its discretion. He reasoned that the "loss of detail" that would result from excluding the audiovisual recordings would result in substantial prejudice. Id. at 7, 9. He concluded that there is "no requirement that the State prove that the prejudice be such that the State is substantially less likely to obtain a conviction." Id. at 10-11.
¶ 59. The State petitioned this court for review, which we granted on February 11, 2013.
III. STANDARD OF REVIEW
¶ 60. "A decision to grant or deny a motion to withdraw [a plea] is within the discretion of the trial court." State v. Rhodes, 2008 WI App 32, ¶ 7, 307 Wis. 2d 350, 746 N.W.2d 599. "A circuit court's discretionary decision to grant or deny a motion to withdraw a plea before sentencing is subject to review under the erroneous exercise of discretion standard." Jenkins, 303 Wis. 2d 157, ¶ 30 (citing State v. Kivioja, 225 Wis. 2d 271, 284, 592 N.W.2d 220 (1999)). All that "this court need find to sustain a discretionary act is that the circuit court examined the relevant facts, applied a proper standard of law, and, using a demonstrated rational process, reached a conclusion that a reasonable *32 judge could reach." Id. (quoting Loy v. Bunderson, 107 Wis. 2d 400, 414-15, 320 N.W.2d 175 (1982)).
IV ANALYSIS
¶ 61. "Withdrawal of a guilty plea before sentencing is not an absolute right." Jenkins, 303 Wis. 2d 157, ¶ 32 (citing Canedy, 161 Wis. 2d at 583). "[A] circuit court should 'freely allow a defendant to withdraw his plea prior to sentencing for any fair and just reason, unless the prosecution [would] be substantially prejudiced.' " Id., ¶ 2 (citing Bollig, 232 Wis. 2d 561, ¶ 28). "[T]he burden is on the defendant to offer a fair and just reason for withdrawal of the plea" by a preponderance of the evidence. Canedy, 161 Wis. 2d at 583-84. "[0]nce the defendant presents a fair and just reason, the burden shifts to the State to show substantial prejudice so as to defeat the plea withdrawal." Bollig, 232 Wis. 2d 561, ¶ 34.
¶ 62. Because the State has conceded that Lopez has shown a fair and just reason for withdrawing her pleas, the burden is on the State to show that granting the withdrawal would cause it substantial prejudice. If the State meets this burden, Lopez "must rebut evidence of substantial prejudice to the State." Jenkins, 303 Wis. 2d 157, ¶ 43.
¶ 63. The State argues that it would be substantially prejudiced by Lopez's plea withdrawal in three ways. First, the State claims that its inability to introduce A.O.'s audiovisual recordings under Wis. Stat. § 908.08 constitutes substantial prejudice. Second, the State argues that A.O.'s faded memory as a witness constitutes substantial prejudice. Finally, the State as *33 serts that it would be substantially prejudiced by the harm to A.O. that would result from forcing her to testify.
¶ 64. Lopez argues that the State has not shown that it would be substantially prejudiced if she were allowed to withdraw her pleas. She contends that the State offered no evidence that A.O. is unable to testify or that her memory has faded. Lopez asserts that the State did not show that it would be more difficult to prove its case and that, in fact, significant portions of the evidence could still be admitted at trial. Lopez also argues that the trial court did not actually find the audiovisual recordings admissible under Wis. Stat. § 908.08, but rather, erroneously found them admissible as prior consistent statements under Wis. Stat. § 908.01(4)(a)2. Thus, Lopez argues that A.O.'s age is irrelevant to the evidentiary determination and therefore, substantial prejudice cannot result.
¶ 65. We conclude that the circuit court found the audiovisual recordings admissible under Wis. Stat. § 908.08, and did not erroneously exercise its discretion when it determined that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. Therefore, we reverse the court of appeals.
A. Admission of A.O.'s Audiovisual Recordings
¶ 66. On October 8, 2008, just six days after the filing of the criminal complaint, the State provided notice to Lopez of its intent to use the audiovisual recordings of A.O.[14] The State sought admission of A.O.'s audiovisual recordings as the "Audiovisual Record *34 ing of Child's Statement" pursuant to Wis. Stat. § 908.08. Because A.O. was over 12 but under 16 years of age, the statute required that the circuit court find that the "interests of justice warrant" the admission of the recorded statement. Wis. Stat. § 908.08(3)(a)2. In weighing the admissibility of the recorded statement, the circuit court was required to consider the factors listed in § 908.08(4).
¶ 67. On September 18, 2009, the circuit court heard argument and deemed the audiovisual recordings admissible. The court specifically referenced Wis. Stat. § 908.08(4) in granting the motion:
We're talking here about audio visual recordings of a statement of a child coming in under 908.08 of the statutes.
More specifically, the statute indicates under the law that in this particular case, the audio visual statement can be used before the child's 16th birthday and if the interests of justice warrant its admission under subsection (4) of the statutes.
[A.O.] is fifteen now, I believe. So, she meets the first criteria.
¶ 68. The circuit court began its discussion of how the audiovisual recordings met the requirements for admission by noting that the court had personally viewed the recordings:
I've viewed the video tapes, as I've indicated, in this matter. Although the child does have the capacity to verbalize about them, my sense of recollection from looking at those tapes was that she was, first of all, more comfortable talking in Spanish than she was in English regarding these.
¶ 69. The court then discussed how the recordings satisfied Wis. Stat. § 908.08(4)(a):
*35 She certainly has the chronological age and level of development, capacity to understand the significance of the events.
¶ 70. The court went further, addressing her physical and mental health, as required by Wis. Stat. § 908.08(4) (b):
She seemed to be, despite the allegations that were put forth by the State and as a result of what I saw on the tape, physically and mentally healthy enough to testify both in person and as was presented on the tape, particularly since she's now been living in a different environment.
¶ 71. The court also discussed the factors in Wis. Stat. § 908.08(4)(c), (d), and (e), including the alleged criminal assault by a family member and its emotional impact on A.O.:
The events about which this child's statement is made certainly constitute, assuming she is believed, the criminal or antisocial conduct perpetrated against the child. And that [A.O.] had a close emotional relationship with the defendant in this matter. And the conduct constitutes a battery at [a] minimum, and the allegations clearly are physical abuse. And its duration and the extent of that are set forth in the tape.
I think that it's also fairly clear here that the child's emotional relationship to those involved in the underlying proceeding were set forth in the tape. Her behavior or reaction to the previous events that occurred to her were all set forth as I looked at the tape.
¶ 72. The court also explained its consideration of Wis. Stat. § 908.08(4)(f), (g), and (h), and A.O.'s manifestations in the interview:
There are other considerations set forth in the statute that I did take into account as well. The child's *36 behavior, attitude, demeanor during the course of the interview I took into account. How the child responded to various questions. And when I say how, I don't mean the substance of the answers other than that they were related to the questions that were asked but whether or not she seemed hysterical or straightforward in her presentation, things of that type. Whether or not she evinced any signs of fear, guilt, anxiety, stress and so forth.
¶ 73. The court determined that the recordings were reliable and deemed them admissible:
I found the tapes to be pretty much straightforward. They were interviewed. The person conducting the interview attempted to put [A.O.] at ease as much as possible. Explained the purpose of the proceedings. [A.O.] clearly understood the difference between truth and lying. She will be testifying as well in this matter.
I believe that under the considerations that the Court needs to look at, that allowing the audio visual tapes to be introduced is appropriate. However, [A.O.] would need to testify first.
¶ 74. Finally, the court reemphasized that the video recordings were trustworthy:
The videotape also, as I've indicated, clearly shows the understanding on the part of the child regarding the importance of telling the truth and that the content, circumstances of the statement contained within the tape on their face provide an indicia of trustworthiness.
¶ 75. Having ruled that the audiovisual recordings of A.O. were admissible under Wis. Stat. § 908.08, the court then addressed, presumably in response to argument from Lopez's attorney, the admissibility of the recordings as prior consistent statements:
*37 And I believe these tapes then come in under 908.01 sub (4)(a)2, which provides that a prior consistent statement of a witness is not hearsay if the declarant testifies at trial and is subject to cross-examination; the statement is consistent with the declarant's testimony, which I assume it will be; and the statement is offered to rebut any express or implied charge against the declarant of a fabrication or improper influence or motive.
In addition to being allowed by statute, there is case law that allows the tapes to be used in that regard. I would simply note to the parties that one of the more recent cases was Ansani vs. Cascade Mountain, Inc., at 223 Wis. 2d 39. That's a 1998 case.
Although it is unclear whether the court's determination regarding admissibility of the recordings as a prior consistent statement was proper, the fact remains that the court first properly deemed the recordings admissible pursuant to Wis. Stat. § 908.08.
¶ 76. The court's intent to admit the audiovisual recordings under Wis. Stat. § 908.08 can be found elsewhere in the record. During the pretrial proceedings, the court referenced the importance of conducting a timely trial so that this evidence could be admitted under § 908.08. For example, in response to a July 2009 request by Lopez's third attorney to withdraw as counsel, the court stated "I realize May of next year is still ten months away. But, at that point in time, the alleged victim in this matter would be turning sixteen, which would impact on the use of the Safe Harbor tapes." At that time, the court refused to allow further delay in the proceedings. The court's concerns regarding a delay reflect that A.O.'s sixteenth birthday would impact the admission of this evidence under § 908.08. The court's *38 admission determination was not focused on admission of the recordings as prior consistent statements. Appellate courts are not quick to reverse a reasoned evidentiary determination of the circuit court. See, e.g., State v. Ringer, 2010 WI 69, ¶ 24, 326 Wis. 2d 351, 785 N.W.2d 448.
¶ 77. In sum, the State clearly gave notice that it sought to admit the audiovisual recordings of A.O. under Wis. Stat. § 908.08. The court made clear on the record that it deemed the recordings admissible under § 908.08. The record demonstrates that the State had every intention of introducing this powerful audiovisual evidence at Lopez's trial under that section. In fact, the State introduced the recordings at Olivas' trial under § 908.08. Regardless of the court's earlier comment that the recordings "come in under 908.01 sub (4)(a)2," the court clearly deemed the recordings admissible under § 908.08, and it understood that A.O. turning 16 years old would impact their admissibility. Thus, once A.O. turned 16 years old the State's most compelling piece of evidence was no longer admissible at trial in the same way, if at all. The fact that the State would be precluded from introducing the recorded statements of the child victim under § 908.08 is of great significance to a substantial prejudice analysis.
B. Substantial Prejudice To The State
¶ 78. At the outset, we note that the circuit court did not decide Lopez's motion to withdraw her pleas in a vacuum. In reaching its conclusion, the court, which would be conducting the trial in this case, considered the value of the audiovisual evidence and the effect that allowing Lopez to withdraw her pleas would have on the victim and the State. Ultimately, the court con- *39 eluded that substantial prejudice would befall the State if Lopez were allowed to withdraw her pleas. The court was thus in a particularly good position to reasonably conclude that "this is an absolutely clear and easy call on my part to find that if the State was not allowed to use the Safe Harbor tapes it would result in substantial prejudice to the State." We sustain the court's determination and now turn to the facts which underlie that conclusion.
¶ 79. On November 19, 2009, Lopez pled no contest to several counts. The court found her guilty and ordered a PSI. In exchange for her pleas, the State agreed to dismiss but read in 16 of the 22 counts against her. The dismissed counts could be considered for sentencing purposes. The State did not otherwise agree to any limitations regarding sentencing.
¶ 80. At the time of Lopez's pleas, the court had already deemed the audiovisual recordings of A.O. admissible under Wis. Stat. § 908.08, and had already discussed the need to proceed to trial before A.O. turned 16 years old. Thus the court, the State, and Lopez were all aware of the significance of having a trial before that date. Even defense counsel had acknowledged that the recordings would not be admissible once A.O. reached her sixteenth birthday.[15]
*40 ¶ 81. On March 19, 2010, four months after Lopez entered her pleas, she moved the court pro se to withdraw her pleas. As A.O.'s biological mother, Lopez would have known that her motion came less than two months before A.O.'s sixteenth birthday, at which time A.O.'s age would then render her audiovisual interviews inadmissible under Wis. Stat. § 908.08. Lopez's motion also came just ten days after the PSI was filed. The PSI recommended that Lopez be sentenced to a maximum of 37 years imprisonment, with 25 years of initial confinement followed by 12 years of extended supervision. The PSI also recommended Lopez have no contact with her children. On March 18, 2010, just one day before Lopez's change of heart, Lopez's husband, Olivas, had been sentenced to 57 years imprisonment.
¶ 82. The contrast between Lopez's dilatory pretrial conduct and her more recent post-plea enthusiasm for putting the State to its burden of proof at a trial does not escape our notice. While not jugular in our review of the substantial prejudice analysis, we note that Lopez's delayed request to withdraw her pleas was also commented on by the trial court on May 4, 2010. The court stated that "[t]his is clearly at this point reaching absurdity and obvious delaying and obstruction," and that Lopez "certainly did not expeditiously seek to withdraw her plea[s]." Certainly, the court understood that Lopez's PSI recommended that she receive a lengthy prison sentence and have no contact with her children, and her motion was made just one day after her husband, Olivas, had been sentenced to 57 years imprisonment. The timing of her motion at least raises a question regarding the motivation underlying her change of heart.
¶ 83. Specifically, in any of the approximately 13 months before she entered her pleas, Lopez had every *41 opportunity to request a timely trial. In fact, she could have demanded, but did not demand, a speedy trial. Wis. Stat. § 971.10(2)(a). Instead of insisting on a more expeditious trial date, the record reflects that Lopez seemed to prefer delay. For example, on December 17, 2008, two days before her final pretrial conference, Lopez sought and received a continuance. On January 27, 2009, Lopez's first attorney moved to withdraw as counsel at Lopez's request. The court granted the motion. On April 10, 2009, Lopez's second attorney moved the court to withdraw as counsel, again at Lopez's request. The court granted the motion. On July 7, 2009, Lopez filed a pro se motion with the court seeking to dismiss her third attorney. On July 22, 2009, Lopez's third attorney followed up on that request by formally moving the court to withdraw as counsel. Clearly, the court believed that Lopez was seeking delay, rather than the opportunity to bring her case to trial. When the court denied Lopez's third attorney's motion to withdraw as counsel on July 31, 2009, it stated "I don't see the delay here being for really any legitimate purpose." Lopez ultimately entered into a plea agreement just weeks before her long delayed trial date.
¶ 84. Thereafter, Lopez moved to withdraw her pleas, and her third attorney moved the court to withdraw as counsel. The court granted counsel's motion. However, when Lopez requested that her fourth attorney withdraw on May 4, 2010, the court stated, "I'm going to deny counsel's motion to withdraw. This is clearly at this point reaching absurdity and obvious delaying and obstruction." The circuit court also noted that the timing of Lopez's request to withdraw her pleas was suspect. The court determined that Lopez might be "using the process and the claim of misunderstanding to delay and frustrate the basic administration of justice *42 here. She certainly did not expeditiously seek to withdraw her plea[s]." It is not unreasonable for the court to reference how the impact of these delays and the timing of the motion would cause substantial prejudice to the State if Lopez were allowed to withdraw her pleas.
¶ 85. Ultimately, on May 18, 2010, the court denied Lopez's motion to withdraw her pleas. Because we afford the circuit court deference when we review its determination, our focus is on the circuit court's findings and conclusions. Indeed, the record reflects that the circuit court appropriately considered the arguments of counsel, the language of the rule, the audiovisual recordings themselves, and the pertinent case law. The court did not deem the audiovisual recordings to be just one more, cumulative, piece of evidence. Instead, the court concluded they were "compelling" and that proceeding to trial without being able to admit them as Wis. Stat. § 908.08 evidence would cause the State substantial prejudice.
¶ 86. The test for substantial prejudice that Lopez espouses is whether the State might still be able to prove guilt beyond a reasonable doubt without admitting the audiovisual recordings under Wis. Stat. § 908.08. The test, however, is not as Lopez wishes. The test is whether the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. The substantial prejudice that would result in this case is that the State would lose the ability to admit significant, persuasive, "compelling" evidence that would otherwise have been admissible under § 908.08 at trial. The circuit court did not find Lopez's arguments compelling, and neither do we.
¶ 87. Simply stated, Lopez now argues that the State is not substantially prejudiced. Lopez opines that the State has enough other evidence and that the State *43 does not need the audiovisual recordings to prove her guilty beyond a reasonable doubt. Lopez concludes that the audiovisual recordings would otherwise be partially admissible and that, in that limited form, they are sufficient. Conveniently, Lopez's defense strengthens as the quantity and quality of the State's evidence weakens. Notably, even though the recordings were played as Wis. Stat. § 908.08 audiovisual recordings at Olivas' trial, the jury in that case still returned a verdict of not guilty on three counts. Lopez's assertion that the State's case is strong enough without the § 908.08 recordings is simply not the applicable legal standard.
¶ 88. The plain language of Wis. Stat. § 908.08 should mean something. Section 908.08 makes no room for admission of the recordings once the child turns age 16. If audiovisual recordings could otherwise be deemed admissible and presented to the jury in the same way regardless of age, the limitations and the factors listed in § 908.08(4) would be of little significance.[16] While it is true that portions of the recordings could be deemed admissible at trial, that outcome is far from certain. Even if they were so admitted, the fact remains that once A.O. turned age 16, the recordings would no longer be admissible in their entirety, both aurally and visu *44 ally, without interruption and without limitation, as would have been permitted under § 908.08 pursuant to the court's ruling. No other evidentiary provision allows for these recordings to be viewed and heard by the jury in the manner envisioned under § 908.08. When the State lost the ability to introduce the recordings under § 908.08, it was substantially prejudiced.
¶ 89. Wisconsin Stat. § 908.08 was enacted in response to "epidemic levels of child abuse in Wisconsin." 7 Daniel D. Blinka, Wisconsin Practice Series: Wisconsin Evidence § 808.1, at 884 (3d ed. 2008). The purpose of the law was to "allow children to testify in criminal [proceedings] ... in a way which minimizes the mental and emotional strain of their participation in those proceedings." Id., at 884-85; 1985 Wisconsin Act 262 § 1. If Lopez were allowed to withdraw her pleas, the State could no longer admit the audiovisual recordings under § 908.08 and, thus, the purpose of the statute would be frustrated. Contrary to the purpose of the law, if Lopez were allowed to withdraw her pleas, A.O.'s "mental and emotional strain" would be maximized rather than minimized.
¶ 90. Conveniently, it is Lopez who now wishes to put the State to its burden to prove each and every element of the offenses charged beyond a reasonable doubt. While putting the State to its proof was her absolute right before she entered her pleas of no contest, once she entered her pleas she no longer automatically has the right to proceed to trial. See Jenkins, 303 Wis. 2d 157, ¶ 32. Rather, now that Lopez has entered her pleas, the court is endowed with discretion to decide whether Lopez had shown a "fair and just reason" for the withdrawal, and whether allowing her to withdraw her pleas would cause "substantial prejudice" to the State. Id., ¶ 2.
*45 ¶ 91. We conclude that the circuit court indeed applied the appropriate test to the case at issue when it stated "[it is] the State's burden to prove that allowing the defendant to withdraw her plea would result in substantial prejudice to the State." The court personally viewed the recordings and had concluded that they were admissible. The court concluded that the recordings were lengthy, compelling, timely, and credible:
In this case the Safe Harbor tapes taken of the victim [A.O.] are lengthy. If I remember correctly they're about three-and-a-half hours long. They are compelling. The testimony in the tape is credible. It's recent to when the events occurred. The testimony is specific. Clear.
¶ 92. The circuit court considered whether the passage of time would impact A.O.'s ability to convey the same message at trial. The State argued that the significant passage of time caused it substantial prejudice because, in part, memories fade:
Over the nearly two years that have elapsed, or to be more accurate, 20 months that have elapsed since the recordings were made, memories do fade. Those recordings include the description of incidents that took place close to six months in some cases even before the recordings were made as the information alleges that some of this conduct was alleged to have taken place as early as April of 2008, so the incidents occurred as early as in some cases as two years ago.
The State further asserted that it would be substantially prejudiced because A.O. could not now present herself as the terribly abused child reflected in the recordings:
Not only the issue of accuracy and accurate reflection of memory that is preserved in those tapes, but *46 also those tapes are demonstrative of [A.O.'s] state, her physical state and her emotional state at the time that they were made. Her demeanor, which is essential to credibility determination, which is an essential function of course of a jury, or trier of fact, are lost if we cannot present those recordings. In those recordings she looks like a terribly abused child that she was.
¶ 93. Seeming to track the State's argument, the court concluded that the State was substantially prejudiced because the victim would not now be able to replicate the recorded testimony at trial:
I think there's a real risk that she has, in fact, again just given the passage of time and the clarity and specificity of her testimony there's no way that she could ever be expected to reproduce the testimony she gave in the Safe Harbor tapes and she shouldn't be forced to,... .
¶ 94. In addition to the passage of time, the court reasonably considered how A.O.'s therapy would impact her ability to testify at trial, and thus prejudice the State. The State argued that A.O.'s progress in therapy meant that she would not present the same testimony at trial:
Fortunately for her now, she's doing very well and looks great and that's not the same presentation that would be made at trial at this point in time. It wouldn't accurately reflect how she appeared at the time and that is a substantial prejudice that the State would suffer.
¶ 95. The court apparently agreed with the State and concluded:
I have to believe that part of [A.O.'s] therapy and recovery from everything that happened to her has included a need to forget somewhat, to move on, to *47 move forward, to try to make the best of the future life in an attempt to overcome the harm that was done to her. If she is indeed successful in her recovery and therapy, then hopefully some of the things she's already forgotten. I hope for her sake that's the case.
¶ 96. The State further argued that it would be substantially prejudiced if it lost these contemporaneous recordings, as they are the most accurate testimony available:
She was 14 years old at the time that she was found. She was interviewed days after she was rescued and the video recordings are now close to 20 months old. She was a child witness. And those video recordings are precluded from being admitted because she turned 16 a few days ago. Those video recordings are the most accurate testimony available of what happened of her view at that point in time.
¶ 97. The circuit court agreed that, given her age, A.O. would not appear to be the same victim at trial:
The age of the victim as reflected in the tapes is significant. And today if she was forced to testify of the passage of time from when the events occurred is significant here.
¶ 98. Thus, the court did weigh and consider whether the State would be substantially prejudiced if it were required to rely on A.O. as a witness without being able to present the recordings under Wis. Stat. § 908.08. The court determined that these recordings were compelling and powerful. The court concluded that substantial prejudice would befall the State if it were required to proceed without being able to introduce the recordings under § 908.08. The court found that A.O. would be unable to convey the same message at trial without the § 908.08 presentation. The passage *48 of time and the State's inability to introduce the audiovisual recordings under § 908.08 constituted substantial prejudice. The court concluded that it was "an absolutely clear and easy call" that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. The court's conclusions regarding the impact on the victim were reasonable. Losing the ability to introduce the recordings under § 908.08 would not merely result in the same testimony being presented in a different form, but the State would be substantially prejudiced because, as the State put it: "central to this trial and central to the evidence in this case are the video recorded statements taken by detectives at Safe Harbor of [A.O.], the principal victim,...." Without admitting the recordings as envisioned under § 908.08, the State was left with a completely different and less compelling presentation of its evidence.
¶ 99. Indeed, as part of its determination regarding substantial prejudice, the court considered relevant case law, and correctly concluded that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas:
[L]ike the finding by the trial court in the Bollig case and the Rushing case that I referred to, because the State would face substantial prejudice to not be allowed to use the Safe Harbor tapes, the defendant's motion to withdraw her plea is denied.
¶ 100. In Bollig and Rushing, the trial court determinations of substantial prejudice to the State were upheld by this court and the court of appeals respectively. The substantial prejudice in Bollig and Rushing did not occur because the State lost the ability to introduce an audiovisual recording of the victim taken at a time nearly contemporaneous with the alleged offenses. The substantial prejudice in Bollig and *49 Rushing resulted from the fact that the victim's memory would likely have faded given a delay. In the case at issue, not only does the State suffer the kind of prejudice which results from a delay impacting the victim's memory, but here the State suffers the additional loss of significant, persuasive, "compelling," audiovisual evidence that would otherwise have been admitted under Wis. Stat. § 908.08.
¶ 101. In Bollig the defendant pled guilty to attempted sexual contact with a child under the age of 13 in violation of Wis. Stat. §§ 939.32(1) and 948.02(1) (1995-96). Bollig, 232 Wis. 2d 561, ¶ 3. Seven months later, prior to sentencing but after having learned that he would be required to register as a sex offender, the defendant moved the court to withdraw his plea. Id., ¶¶ 6-7. The circuit court concluded that the defendant's misunderstanding regarding sex offender registration did constitute a "fair and just reason" for plea withdrawal. The court went further, however, to explain that even if this did constitute such a reason, the State would still be substantially prejudiced if the defendant were allowed to withdraw his plea. Id., ¶¶ 6-7, 31-33. The circuit court found substantial prejudice in that it would:
soon be 2 years since the event occurred, and one, that has been a long time hanging over the head of the victim, secondly, the victim is a child, long time to expect evidence and testimony recollections to remain fresh, so that any trial that would be held at this late date might not, would not be fair to the victim, would not be fair to the state.
State v. Bollig, 224 Wis. 2d 621, 640, 593 N.W.2d 67 (Ct. App. 1999).[17]
*50 ¶ 102. On appeal, this court agreed that the State would be substantially prejudiced because the defendant's plea withdrawal "would hamper the victim's ability to recall pertinent events." Bollig, 232 Wis. 2d 561, ¶ 43. As in the case at issue, the child victim in Bollig was available to testify, but the passage of time would have rendered the victim's testimony less persuasive and, therefore, constituted substantial prejudice to the State. Unlike the case at issue, however, in Bollig the State did not lose the ability to introduce an audiovisual recording of the child victim under Wis. Stat. § 908.08. Here, the State would not only be prejudiced by the delay's impact on the testimony, as in Bollig, but in the case at issue, the State would also lose the ability to introduce the audiovisual recordings under § 908.08.
¶ 103. In Rushing the substantial prejudice to the State was not due to the State losing the ability to admit audiovisual evidence, but rather, as in Bollig, it was due to the likely impact the delay would have on the victim's testimony. The defendant in Rushing pled guilty to first-degree sexual assault of a child, contrary to Wis. Stat. § 948.02(1) (2004-05). Rushing, 305 Wis. 2d 739, ¶ 1. Ten months later, but still before sentencing, the defendant sought to withdraw his plea.[18] The circuit court denied the defendant's motion, concluding that allowing the defendant to withdraw his plea would cause substantial prejudice to the State. The court *51 noted that a video interview of the child, which the State intended to introduce at trial, was " 'reflective of a [sic] extremely difficult child,' who 'appeared to be very reluctant, very hard to interview, very hyperactive, very unwilling to engage in the facts and circumstances in an — any substantial way.'" Id., ¶ 9. Considering the passage of time, the court stated" '[w]e're now more than a year and a half away from the actual incident, and according to the affidavit provided by the State, bis memory has clearly been impaired, and that's easy to understand, when one sees the videotape.'" Id. The court concluded that, despite the fact that the video recording would still have been admissible at trial, forcing the State to put this victim on the stand for cross-examination after the passage of such a substantial amount of time would constitute substantial prejudice to the State.
¶ 104. The court of appeals agreed, concluding that the faded memory of a victim could result in less persuasive testimony, and thus cause substantial prejudice to the State. Rushing, 305 Wis. 2d 739, ¶ 16. Like the case at issue, in Rushing the State had a fairly contemporaneous audiovisual recording of the victim. Unlike the case at issue, however, the State in Rushing would not have been precluded from introducing that video at trial if the defendant were allowed to withdraw his plea. Nonetheless, the court of appeals affirmed the circuit court's determination that the State would be substantially prejudiced, even though, unlike the case at issue, the State would not otherwise lose the ability to present Wis. Stat. § 908.08 evidence. Compare State v. Nelson, 2005 WI App 113, 282 Wis. 2d 502, 701 N.W.2d 32.[19]
*52 ¶ 105. In sum, the substantial prejudice to the State in the case at issue encompasses not only the same kind of prejudice found in Bollig and Rushing, but unlike those cases, the State here also loses the ability to introduce audiovisual recordings of the victim under Wis. Stat. § 908.08. Thus, the circuit court's conclusion that "this is an absolutely clear and easy call... to find that if the State was not allowed to use the Safe Harbor tapes it would result in substantial prejudice to the State" is quite defensible.
¶ 106. Here, the circuit court's determination that the State would be substantially prejudiced is reasonable, consistent with Wisconsin precedent, and supported by the record. The substantial prejudice to the State in this case would result not only from the delay and faded memory of the victim, but also the loss of significant, persuasive, "compelling," and admissible audiovisual evidence under Wis. Stat. § 908.08. The circuit court did not erroneously exercise its discretion when it concluded that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas.
V CONCLUSION
¶ 107. We hold that the circuit court did not erroneously exercise its discretion when it determined that the State would be substantially prejudiced if Lopez were allowed to withdraw her pleas. We sustain *53 the discretionary determination of the circuit court because the record reflects that it was "the product of a rational mental process by which the facts of record and law relied upon are stated and are considered together for the purpose of achieving a reasoned and reasonable determination." Canedy, 161 Wis. 2d at 580. Accordingly, we reverse the court of appeals.
By the Court. — The decision of the court of appeals is reversed.

 The Honorable Nicholas McNamara presided.

 Lopez contended that her pleas were rushed, and that she entered her pleas unknowingly due to her limited English. Because the State conceded this issue, this opinion assumes, *5 without deciding, that these facts constitute a "fair and just reason" for Lopez to withdraw her pleas.

 All subsequent references to the Wisconsin Statutes are to the 2009-10 version unless otherwise indicated.

 The criminal complaint refers to the victim as "AOL."

 Any audiovisual recordings beyond these two are not the subject of this court's review.

 All quotations from the audiovisual recordings are A.O.'s own words, as translated in the audio track of the recording.

 Wisconsin Stat. § 908.08 provides, in relevant part:
(1) In any criminal trial or hearing.. . the court or hearing examiner may admit into evidence the audiovisual recording of an oral statement of a child who is available to testify, as provided in this section.
(2)(a) Not less than 10 days before the trial or hearing, or such later time as the court or hearing examiner permits upon cause shown, the party offering the statement shall file with the court or hearing officer an offer of proof. . . . That party shall give notice of the offer of proof to all other parties, including notice of reasonable opportunity for them to view the statement before the hearing under par. (b).

 Olivas' trial date was later postponed to December 1,2009.

 The Honorable Stuart Schwartz presided over both this hearing and the September 18, 2009 motion hearing.

 Wisconsin Stat. § 908.08(4) provides:
(4) In determining whether the interests of justice warrant the admission of an audiovisual recording of a statement of a child who is at least 12 years of age hut younger than 16 years of age, among the factors which the court or hearing examiner may consider are any of the following
*17 (a) The child's chronological age, level of development and capacity to comprehend the significance of the events and to verbalize about them.
(b) The child's general physical and mental health.
(c) Whether the events about which the child's statement is made constituted criminal or antisocial conduct against the child or a person with whom the child had a close emotional relationship and, if the conduct constituted a battery or a sexual assault, its duration and the extent of physical or emotional injury thereby caused.
(d) The child's custodial situation and the attitude of other household members to the events about which the child's statement is made and to the underlying proceeding.
(e) The child's familial or emotional relationship to those involved in the underlying proceeding.
(f) The child's behavior at or reaction to previous interviews concerning the events involved.
(g) Whether the child blames himself or herself for the events involved or has ever been told by any person not to disclose them; whether the child's prior reports to associates or authorities of the events have been disbelieved or not acted upon; and the child's subjective belief regarding what consequences to himself or herself, or persons with whom the child has a close emotional relationship, will ensue from providing testimony.
(h) Whether the child manifests or has manifested symptoms associated with posttraumatic stress disorder or other mental disorders, including, without limitation, reexperiencing the events, fear of their repetition, withdrawal, regression, guilt, anxiety, stress, nightmares, enuresis, lack of self-esteem, mood changes, compulsive behaviors, school problems, delinquent or antisocial behavior, phobias or changes in interpersonal relationships.
(i) Wdiether admission of the recording would reduce the mental or emotional strain of testifying or reduce the number of times the child will be required to testify.

 While there is no indication in the record that Lopez's testimony at Olivas' trial was part of her plea agreement, she did admit to physically abusing A.O. in her testimony. The State described Lopez's plea agreement as "substantially the same offer that has been available to her since the middle of summer [2009]. It's just that now she wishes to accept it... ."

 The Honorable Stephen E. Ehlke presided over Olivas' trial and subsequent sentencing.

 The testimony on May 4, 2010, went to showing whether Lopez entered her pleas "knowingly, intelligently, and voluntar *23 ily." The parties did not address the fair and just reason for Lopez's plea withdrawal or the substantial prejudice to the State until May 18.

 At that time, only the October 6,2008 recording had been made. On July 3, 2009, the State provided notice to Lopez of its intent to use the October 16, 2008 recording.

 On May 18, 2010, at the hearing on Lopez's request to withdraw her pleas, the court engaged in the following exchange with counsel:
THE COURT: And do you acknowledge that under Section 908.08(3) that the State would not he allowed to use the Safe Harbor tapes at trial in this case?
[DEFENSE COUNSEL:] Because of the age?
[THE COURT:] Yes.
[DEFENSE COUNSEL:] I believe that would be the case.

 While audiovisual recordings of children that do not meet certain requirements of Wis. Stat. § 908.08 may be deemed admissible under hearsay exceptions, see, e.g., § 908.08(7), State v. Snider, 2003 WI App 172, 266 Wis. 2d 830, 668 N.W.2d 784, this does not mean that such recordings are automatically admissible, nor does it mean that the recordings would be played in the same manner as allowed under § 908.08. No guaranty of admissibility applies to the other hearsay exceptions. Audiovisual evidence admitted outside of § 908.08 would be presented in a manner consistent with the hearsay exceptions, which are not likely to permit a party to simply play the recording in its entirety for the jury.

 The quotation of the trial court record is included in the court of appeals decision, but not in the opinion of this court.

 The substantial time between the entry of the defendant's plea and his plea withdrawal is accounted for by an unusual procedural issue. Two months after his plea hearing, the defendant proclaimed his innocence during the presentence investigation interview. On learning this, the circuit court vacated the defendant's plea sua sponte. Six months later, acknowledging that the vacatur was improperly entered, the court reinstated the defendant's plea. It was at this point that the defendant filed his formal plea withdrawal motion.

 In State v. Nelson the State alleged that it would he substantially prejudiced if the defendant were allowed to with *52 draw his pleas because it had "lost contact" with the victim. 2005 WI App 113, ¶ 19, 282 Wis. 2d 502, 701 N.W.2d 32. The State conceded that "at some point we probably would be able to locate [the victim] again." Id. The court concluded that, while the State "may have been somewhat inconvenienced" by the withdrawal of the defendant's pleas, the State "failed to meet its burden" to show substantial prejudice. Id., ¶ 22. These facts are dramatically different than the case at issue here.

 A court should allow a defendant to withdraw his plea due to a manifest injustice when the defendant proves:
(1) he was denied the effective assistance of counsel guaranteed to him by constitution, statute, or rule;
(2) the plea was not entered or ratified by the defendant or a person authorized to so act in his behalf;
(3) the plea was involuntary, or was entered without knowledge of the charge or that the sentence actually imposed could he imposed; or
*56 (4) he did not receive the charge or sentence concessions contemplated by the plea agreement and the prosecuting attorney failed to seek or not oppose these concessions as promised in the plea agreement.
American Bar Association (ABA) Project on Minimum Standards for Criminal Justice — Pleas of Guilty § 2.1(a)(ii)(l)-(4) (Tentative Draft, Feb. 1967).