OPINION
FABE, Chief Justice.
I. INTRODUCTION
A criminal defendant on trial for two murders sought to admit a recording of a phone call to the police, placed by a young woman who had since died. On the recording, the young woman told a police officer that one of the victims had told her that both victims were conspiring to attack and rob the defendant. In support of his motion to admit the recording, the defendant argued that the recording was critical to his defense, which centered on justified self-defense and heat of passion. The defendant invoked the hearsay exceptions for a declarant's then existing state of mind, an unavailable declarant's statement against penal interest, and the residual exception for unavailable declarants, as well as his constitutional right to present a defense. The superior court denied the motion. The jury, presented with no evidence of the alleged conspiracy to attack and rob the defendant, convicted him of first- and second-degree murder, He appealed, and the court of appeals affirmed his conviction,
We granted the defendant's petition for hearing to decide whether the deceased witness's statement should have been admitted at trial, We conclude that it should have *415 been admitted, and we therefore reverse the defendant's convictions and remand for a new trial. a b
II, FACTS AND PROCEEDINGS
A. Facts
1. The incident
On New Year's Eve 2006, Ryan'Sanders shot and killed Travis Moore and Ashlee Richards at his home,. Sanders had invited Moore to a gathering at Sanders's apartment, after Moore called him several times that evening. Moore arrived in an SUV with Richards, Raven Ketzler, and his girlfriend Sherrell Porterfield, Moore, who was carrying an unloaded 9mm caliber Beretta pistol, entered Sanders's apartment with Porterfield and Richards, who was carrying a push knife.[1] The three left a machete in their SUV along with Ketzler, who did not come into Sanders's apartment during the more than thirty minutés the other three were inside. Nine people were present in Sanders's apartment: Sanders; Moore; Richards; Porterfield; - Sanders's brother, Joseph; Sanders's one-year-old daughter; Sanders's girlfriend, Melissa; Sanders's girlfriend's brother, Jeremy; and Jeremy’s girlfriend, Mary Jane.
According to Sanders's statement to the police, he was talking in his bedroom with his brother and Moore when Moore pulled out his Beretta and hit Sanders's head with it, splitting open the skin above his eyebrow. Sanders fell to the ground between his bed and the wall, reached for a nearby .88 caliber revolver, and shot at Moore four or five times. Two bullets struck Moore. According to Sanders, everyone, including Moore, ran from the shots. Moore collapsed and died outside the apartment alongside the walkway leading to the front door.
Sanders, who claimed he was unsure whether he had hit Moore, grabbed a 40 caliber Glock semi-automatic handgun and ran outside. He saw "a black coat with fur on it running towards [the] SUV" and remembered that Moore had been wearing a "big black jacket" with fur on it. Sanders stated that he pursued and shot at the running person, not noticing Moore's body as he ran past it. The running person was Richards. Sanders shot Richards nine times, and a tenth bullet grazed her hand. Richards was pronounced dead at the hospital.
Sanders claimed that he stopped shooting after Richards fell and that he was five to ten feet away. Forensic evidence and some witness testimony, however, suggested that some shots were fired into Richards after she fell. Sanders also stated that he did not realize that he had been shooting at someone other than Moore until after it was over, when he approached Richards and saw her hair and then saw Moore's body for the first time while returning to the apartment. Richards was an overweight Caucasian woman with hair past her shoulders. Moore was a fit African-American man with short-cropped hair,
Back in his, apartment Sanders put down his Glock and waited. Before the police arrived Sanders asked his girlfriend's brother, Jeremy, to get the .38 out of the apartment. Jeremy hid the .88 in a parking lot underneath a car, where the police later found it.
The first police officer arriving on scene had to swerve to miss the SUV in which Moore arrived and which was pulling out of the driveway. After stopping for a moment when it almost hit the first officer's car, the SUV continued to try to leave. The second officer to arrive blocked the street, stopping the SUV from leaving.
Sanders, holding a "really bloody" towel to his head, told the first officer that he bad been hit in the head with a pistol and then shot two people and that his Glock was inside on the coffee table. While being questioned later at the police station, Sanders denied that any weapons other than a disassembled rifle, Moore's Beretta, and Sanders's Clock had been in the apartment. 'When the police stated that someone had gotten rid of a gun and they had recovered it, Sanders then admitted that the .88 was involved and that he *416 had asked Jeremy to remove it from the apartment. Sanders said that he did so and lied about it only because he had recently. bought the .38 under questionable circumstances. Sanders also stated that he had no idea why Moore: attacked him, but that Moore and Joseph, Sanders's brother, had "real problems" because some people, including Joseph, had been at Moore's house and "some money [came] up missing," |
2. Carmela Bacod's statement to the police
Two days after the shootings Detective Mark Huelskoetter, the lead detective in the case, received a phone call from Carmela Bacod, which he recorded,[2] The 17-year-old Bacod described a series of events stretching back "about two weeks now," which had started when "Ryan Sanders, he stole money from one of our friends." She explained that Richards had been her best friend since third grade, that she had known Moore "for a couple months," and that she had met Ket-zler onee. She stated that she had never met Sanders. Bacod reported that she "was supposed to go with them to their house ... that night," and correctly stated that Ketzler and Porterfield, both of whom she physically described, had been present along with Moore and Richards.
Bacod described a phone call with Richards "about a week and a half ago," in which Richards told Bacod that Richards, Moore, Ketzler, and Porterfield had been hanging out with Sanders one night when they all fell asleep and woke up to discover Sanders gone, along with money that had belonged to Ketzler. Bacod told Detective Huelskoctter that "they wanted to go beat him up to get the money back," and that "Ashlee [Richards] just told me that they wanted the money back, and then they were gonna jump 'em for it." Bacod also told Detective Huelskoetter that Richards "told me that earlier they tried before or something like that, and Ryan's brother got mad or something and pulled a gun on [Raven Ketzler's] face, or something like that." And she answered affirmatively when Detective Huel-skoetter asked her, "[YJou know that Travis [Moore] wanted to beat Ryan [Sanders] up over the money?" and "[When they were goin' over -there that was pretty much the idea, is that Travis [Moore] was gonna beat [Sanders] up?"
Later in the call, Bacod was more cireum-spect, When Detective Huelskoetter asked her if she "knew that kinda the plan was that Travis [Moore] and his girlfriend and Ashlee [Richards] and-and some other girl named Raven [Ketzler] were gonna go over there and essentially jump them to get their money back," Bacod stated, "Not-not jump, like, you know, like, talk." She then stated, "But obviously they're young, so, you know, there's gonna be violence in it. But I couldn't stop them." [3]
Bacod gave Detective Huelskoetter her name, date of birth, phone number, and address. She took his name and direct phone number, which she recorded with a pen she requested from her mother, and told him she would call if she thought of anything else.
Sanders was not informed of Bacod's call to Detective Huelskoetter until March 2008, more than a year later. Before trial and less than three months after Sanders had learned of her call, Bacod was killed in a car accident.
B. Proceedings
1. Charges
Ten days after the shootings Sanders was indicted on five counts: first-degree murder of Moore (Count I), first-degree murder of Richards (Count II), second-degree murder of Moore (Count III), second-degree murder of Richards (Count IV), and tampering with physical evidence (Count V).
2. Motion in limine to admit Bacod's statement
In February 2009 Sanders filed a motion in limine to admit Bacod's statement at trial, Sanders argued for admission based upon his due process right to present a defense and *417 Alaska Rules of Evidence 808(8) (the state of mind exception to hearsay) and 804(b)(8) (the exception for. statements against an unavailable declarant's interest) for Richards's statement to Bacod, and 804(b)(5) (the unavailable declarant residual hearsay exception) for Bacod's statement to Detective Huelskoetter.
The superior court denied Sanders's motion, stating that "Ms. Richards'[s] statements to Ms. Bacod regarding her intention to go to the Defendant's residence with Mr. Moore are not admissible under Rule 808(8) as cireumstantial evidence that either Ms. Richards [or] Mr. Moore planned to rob and assault the Defendant." The superior court stated its understanding of the specifics of Richards's statement:
There is no evidence Ms. Richards actually stated she or Mr. Moore planned to assault and rob the Defendant. In the recorded statement, Ms. Bacod extrapolates the inevitability of violence from Ms. Richards'[s] statements.... As earlier noted, Ms. Bacod states that Ms. Richards told them they were going over to the Defendant's residence to talk. Ms. Bacod added that there would likely be violence, but she does not state that Ms. Richards affirmatively stated their intention was to rob or assault the Defendant.
Regarding the applicability of Rule 804(b)(5) to Bacod's statement, the superior court stated that "Itlhe trustworthiness of the statement may not be established by corroborating evidence"-citing Ryan v. State,[4] which in turn cited the United States Supreme Court case Idako v. Wright [5]-and therefore did not consider any extrinsic corroborating evidence. The superior court stated its understanding of the specifics of Bacod's statement:
The relationship between Ms. Bacod, the Defendant, and the shooting victims in this case is essentially unknown. It is clear that all four parties were in the same social circle, but the only evidence of their relationships to one another is contained in the recording itself. . .. The lack of evidence in this respect does not indicate any motivation for Ms. Bacod to lie in the Defendant's favor, but neither does it explain her motivation for calling the police to speak against her fallen friends.[6]
While it is true Ms. Bacod made her statement to a government agent, Ms. Ba-cod was not under oath and there were no subsequent interviews where Detective Huelskoetter or any other government agent could cross-examine Ms. Bacod regarding her statements or otherwise test her knowledge and veracity, The Detective merely took Ms. Bacod's statements and indicated he might contact her again. Ms. Bacod gave her statement telephoni-cally and there is no way to tell where she was or who else was in the room when she made the call. The statements simply are not "so trustworthy that adversarial testing would add little to its reliability." **
Ryan, 899 P.2d at 1375(quoting Idaho v. Wright, 497 U.S. at 821 [110 S.Ct. 3139]); see also Vaska v. State, 185 P.3d 1011, 1020 (Alaska 2006).
8. Trial
Trial took place in August 2010. None of the nine adults who were at the house testified. No evidence was presented regarding Richards's push knife or the machete in the SUV.[7] Bacod's statement was not introduced, *418 and no evidence was presented that Ketzler stayed in the SUV. The superior court instructed the jury regarding five defense theories: justified. self-defense, heat of passion, defense of premises, defense of. a third person, and reagonable mistake of fact. (regarding Richards's identity).
During opening statements and closing arguments, the State maintained that self-defense and defense of others did not apply because Sanders's actions were excessive. The State painted Sanders as a liar who also had others lie for him, and it questioned whether Moore had actually been the first aggressor. The State contended that even if the heat of passion defense initially applied, Sanders had time to cool down while he grabbed the second gun and chased Moore out of the apartment. The State also contended that no justification could defend against the first-degree murder of Richards because it would, be an unreasonable mistake of fact to believe that she was Moore or that she was armed
Durmg opening and closing arguments, counsel for Sanders argued that Sanders had been truthful, stating that he immediately took responsibility for the two deaths, waited quietly for the police, put down the Hock in a safe place, and answered the police officer's questions. Sanders's counsel argued that Sanders quickly told the truth about the .38 and that he had lied at first only because he was worried about that gun's provenance. Counsel for Sanders argued that Sanders committed no crime in killing Moore, who passion. had attacked him without warning in his home, because it was self-defense. His counsel also argued that even if Sanders had not acted in self-defense, he acted in the heat of Counsel further argued that he had made a reasonable mistake of fact regarding Richards's identity, given the low lighting outside, the similarity of Richards's and Moore's coats, and the fast-paced, frenetic situation.
The jury found Sanders not guilty of first-degree murder of Moore, but guilty of the lesser included second-degree murder of Moore under Count I. The jury also found Sanders guilty of the remaining. counts, as charged: first-degree murder of Richards, second-degree murder of Moore under a different theory,[8] second-degree murder of Richards, and tampering with physical evidence. © By returning these verdicts, the jury rejected all five defense theories.[9]
4. Appeal to the court of appeals
On appeal Sanders argued that the superi- or court had erred by refusing to allow him to introduce Bacod's statement at trial.[10] The court of appeals concluded that the superior court "did not abuse [its] discretion" by finding Bacod's statement inadmissible, stating:
Bacod told the pohee that Richards said to her that they were going to go over to Sanders's residence to confront him. . Ba-cod added that ske thought the confrontation was likely to be violent.
*419 [[Image here]]
In the present case, Sanders offered Ba-cod's out-of-court statements for the purpose of proving that Richards and Moore went to Sanders's house intending to use violence to retrieve money from Sanders or his brother, But even according to Bacod, Richards never said that she or Moore intended to use violence; instead Richards said that they wished to talk to Sanders about the money,. In Bacod's statements to the police, she acknowledged that the possibility of violence was only her speculation, or her after-the-fact gloss on her conversation with Richards."[11]
Like the superior court, the court of 'appeals quoted Ryan v. State for the proposition that "evidence admitted under the residual hearsay exceptions must possess 'particularized guarantees of trustworthiness' making it 'so trustworthy. that adversarial testing would add little to its reliability.'[12] " The court added, "[There was essentially no evidence regarding Bacod's potential motivation for contacting the police.[13] The court of appeals upheld. the trial judge's ruling.[14]
Regarding Sanders's argument that the exclusion of Bacod's statement violated his due process right to present a defense, the court of appeals stated, "[Iin general, a trial court does not commit error by properly applying the evidence rules." [15] The court of appeals then concluded: "We have previqusly pointed out the lack of reliability of Bacod's recorded statement to establish the proposition for which it was offered. We conclude that the trial court's proper application of the evidence rules did not unfairly limit Sanders's ability to present a defense.[16]
Chief Judge Mannheimer concurred with the court's opinion, writing separately to point out that Sanders wished to introduce Richards's statement to prove Moore's future actions.[17] Chief Judge Mannheimer cited the Commentary to Rule 8088) (the state of mind hearsay exception) to explain that the Rule "does not allow a litigant to introduce one person's statement about their current mental state (including their eurrent plans) for the purpose of proving another person's future actions." [18] This provided, in his view, an additional reason that the contested statements were not admissible.[19]
5. Petition for hearing
Sanders filed a petition for hearing with this court, and we granted it, in part, on "whether exclusion of Carmela Bacod's hearsay statement to the investigating detective was reversible error,"
Sanders argues that Bacod's statement was admissible under the Rules' of Evidence-using both Rule 808(8) (the state of mind hearsay exception) and Rule 804(b)(5) (the unavailable (eclarant residual hearsay exception)-to show Richards's intent and conduct in going to Sanders's apartment on New Year's Eve. Sanders also argues, based on his constitutional right to present a 'defense, that Bacod's statement was admissible to show both 'Righards's and Moore's intent and conduct in going to Sanders's apartment. Sanders argues that the failure to admit the statement under these theories: was error and that the error was not harmless.
IH. - STANDARD OF REVIEW
A trial court's "[flactual findings are reviewed for clear error. We will reverse ... factual findings only when, after a review of the entire record, we are left with a definite and firm conviction that a mistake Has been made."[20] When the admissibility of *420 evidence "turns on a question of law, such as the 'correct scope or interpretation of a rule of evidence,' we apply our 'independent judgment. ...'" [21] Under the de novo standard of review, we adopt the rule of law that is "most persuasive in light of reason, precedent and policy." [22] 'We also review constitutional interpretation issues de novo.[23]
IV. DISCUSSION
"Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." [24] As a general rule hearsay is not admissible,[25] but the Rules of Evidence contain exceptions [26] and define certain types of out-of-court statements as not hearsay." The proposed evidence in this case contains two levels of hearsay,[27] each of which must be individually admissible for the exclusions Sanders challenges to have been erroneous.[28] If either Richards's statement to Bacod or Bacod's statement to Detective Huelskoetter was inadmissible, the proposed evidence was entirely inadmissible.
A. - Richards's Statement To Bacod Was Admissible As Evidence of Richards's Then Existing State Of Mind Under Alaska Rule Of Evidence 803(8).
Under Alaska Rule of Evidence 803(8), "(al statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health) offered to prove the declarant's present condition or future action," is not exelud-ed by the hearsay rule. Sanders argues that Richards's statement to Bacod was admissible to show Richards's intent and conduct in going to Sanders's apartment, We agree.
The superior court found that "[tlhere is no evidence Ms. Richards actually stated she or Mr. Moore planned to assault and rob [Sanders]." Instead, the superior court concluded, "Ms. Bacod extrapolates the inevitability of violence from Ms. Richards's statement." The court of appeals agreed, stating that "even according to Bacod, Richards never said that she or Moore intended to use violence; instead Richards said that they wished to talk to Sanders about the money." [29] The court of appeals also concluded that "[iln Bacod's statements to the police, she acknowledged that the possibility of violence was only her speculation, or her after-the-fact gloss on her conversation with Richards.[30]
We disagree with this interpretation of Bacod's statement. Bacod's first recorded words to Detective Huelskoetter were, "Everything happened, and she told me, like, actually it's been goin' on for like, about two weeks now. Um, the-Ryan Sanders, he stole money from one of our friends, and they wanted to go beat him up to get the money back." (Emphasis added.) Bacod later stated, "Ashlee just told me that they wanted the money back, and then they were gonna jump 'em for it," and said "[s Ihe fold me that earlier they tried before or something like that." (Emphasis added.) She *421 also answered in the affirmative when Detective Huelskoetter twice asked her direct questions verifying that Moore was planning to go beat up Sanders:
Q. So-but you know that Travis [Moore] wanted to beat Ryan [Sanders] up over the money?
A. Yeah.
Q. And that when they were goin' over there that was pretty much the idea, is that Travis [Moore] was gonna beat [Sanders] up?
A. Yeah.
Only after verifying with Detective Huel-skoetter that Porterfield and Ketzler, who were both still alive, had been present the night of the shooting did Bacod partially backtrack:
Q. So, now, just let me see if I understand correctly, that you knew that kinda the plan was that Travis [Moore] and his girlfriend and Ashlee [Richards] and-and some other girl named Raven [Ketzler] were gonna go over there and essentially jump them to get their money back?
A. Not-not jump, like, you know, like, talk.
[[Image here]]
A. [Tihey're young, so, you know, there's gonna be violence in it.
[[Image here]]
A. But, I couldn't stop them.
Q. Right, So, they-they-I mean basically the only reason they were going over there was to get the money back.
A. Probably.
The State does not forcefully contest that Richards told Bacod about the plan to confront Sanders. Instead it argues that Richards's statement was not of her own intent, but instead the intent of "an unidentified 'they'" But the "they" in question is not unidentified. Bacod named the four people involved, including Richards. When Detective Huelskoetter summarized what Bacod had told him-'"the plan was that Travis [Moore] and his girlfriend and Ashlee [Richards] and-and some other girl named Raven [Ketzler] were gonna go over there and essentially jump them to get their money back"-Bacod did not say that Richards was not part of the group making the plan,. The State's argument that only Moore, and not Richards, intended to beat up Sanders fails for similar reasons: Bacod, in recounting her conversation with Richards, said multiple times that "they"-not just Moore-were going to beat up Sanders.
The State argues that the statements regarding Sanders stealing money are inadmissible hearsay because they are being offered to prove that Sanders stole money. But Sanders offered the statements about the theft to show Richards's motive, not whether Sanders actually stole money. Richards's belief that the theft was committed by Sanders explained her motive in going to Sanders's apartment.[31]
The State also contends the word "jump" as used by Bacod meant "talk," not assault. The State argues that Bacod "expressly defined jump for her purposes." This is contradicted by the statement itself. Before using the word "jump," Bacod stated that the group was planning to "beat [Sanders] up." Bacod twice answered in the affirmative Detective Huelskoetter's direct questions verifying that Moore was planning to go "beat up" Sanders.
Bacod stated that Richards directly expressed her intent to beat up Sanders and her motive for doing so. This statement of Richards's intent and motive was admissible under Rule 8088) to show her future action.[32] Because we conclude that the superi- *422 or court's factual finding that Bacod merely extrapolated: violence from Richards's statement to her was clearly erroneous, we must reverse the court of appeals' decision upholding the superior court's Rule 8088) ruling.
B. Richards s Statement To Bacod Was Admissible As Evidence of Moore's Future Actions Under Alaska Rule Of Evidence 803(283).
Although Richards's statement to Ba-cod was relevant to explain some of Richards's conduct at Sanders's home, its. greater potential relevance was to explain Moore's conduct, which, according to Sanders, included pistol-whipping Sanders without provocation. However, as Chief Judge Mannheimer noted in his concurring opinion below, "the Commentary to Evidence Rule 803(8) explains that Rule 808(8) does not allow a litigant to introduce one person's statement about their current mental state (including their current plans) for the purpose of proving another person's future actions."[33] Thus, if Richards's statement to Bacod was admissible only to demonstrate Richards's future actions, and not Moore's, its probative value might have been outweighed by the danger of unfair prejudice,[34] making it proper for the trial court to exclude it or subject it to a limiting instruction"[35] But the cireum-stances in this case demonstrate that Richards's statement was admissible not only to prove Richards's intent and conduct, but also Moore's.
The Commentary to Rule 808(8) explains that "(flor the statements of one person as to his mental or emotional condition to be used against another, [Evidence Rule 808](23) must be satisfied.[36] Rule 808(23) is a residual hearsay exception, It permits the admission of a statement that would otherwise be excluded as hearsay if it has "circumstantial guarantees of trustworthiness" that are "equivalent" to the listed exceptions, and "if the court determines that (2) the statement is offered as evidence of a material fact; (b) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (c) the general purposes of these rules and the interest of justice will best be served by admission of the statement into evidence." ,
In this case, the party seeking to introduce a statement under the residual exception is a criminal defendant. This fact is important in two interrelated ways. First, Sanders, like all criminal defendants, enjoys a constitutional right to due process of law before he is convicted of a crime."[37] Although it is not absolute, a defendant's right to present a defense is a fundamental element of due process." [38] Evidentiary rulings can so infringe this right to present a defense that they constitute a violation of the guarantee of our constitution's due process clause,[39] which requires admission even of evidence that the legislature has specifically barred if its exclusion "substantially limits the right to present a defense." [40] Here, however, as we explain below, it is an incorrect application of the evidence rules that encroaches on this right.
*423 Sanders presented five defense theories to the jury: justified self-defense, heat of passion, defense. of premises, defense of a third person, and reasonable mistake of fact (regarding Richardsg's identity). The eredi-bility of each of these theories was tied to the jury's willingness to believé' Sarders's account of Moore striking him without provocation, an account that the State argued "doesn't make any sense" during closing argument. The exclusion of Richards's statement to Bacod effectively excluded all evidence of the ' alleged conspiracy to rob Sanders and thus éxcluded critical evidence relevant to the credibility of Sanders's account of the events that preceded the shootings. The jury was left with an account in which, as the State put it in closing argument, Sanders "tells us for no reason, no reason whatsoever, no reason that he's willing to admit, Mr. Moore'whacks him on the head and causes that gash, that gash above. his eye, for no reason whatsoever." The exclusion prevented the jury from hearing the only available evidence of the missing "reason" the State rhetorically lamented. [41]
The second way that Sanders's status Aas a criminal defendant is important is the fact that the State likely could have used Rich-ardsg's statement against Moore if it had sought to prosecute Moore for conspiracy to commit robbery.[42] Alaska Rule of Evidence 801(d)(2)(E) provides that a statement is not hearsay if it "is offered against a party and is . a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." Richards told Bacod about an on-going plan to rob Sanders-a plan that Richards shared with Moore and which they had already attempted to put into action, only to be resisted by Sanders's armed brother. Bacod. was apparently supposed to join her four friends when they went to Sanders's house on the night of the shootings. Moore's actions, including going to Sanders's home with the other alleged participants in the conspiracy while carrying a pistol and, according to Sanders's account, striking Sanders in the face, corroborate his connection to the conspiracy Richards described.[43]
Rule 801(d)(2)(E) is not directly applicable to. this case because Moore is not a party to the State's prosecution of Sanders and thus Richards is not a party's co-conspirator. But Rule 808(28), which must be satisfied "[flor the statements of one person as to [her] mental or emotional condition, to be used against another,[44] allows for the admission of tatements that have "cireumstan-tial guarantees of trustworthiness" that are "equivalent" to the other exceptions to the bar on hearsay. Statements made by a co-conspirator in furtherance of a conspiracy were tradmonally defined as an exception to the hearsay rule, but under the revised Alaska Rules of Evidence they are defined as nonhearsay.[45] | Their characterization as non-hearsay is largely predlcated on expectations of trustworthmess, just like the exceptions listed in Rule 803 [46] Richards's statement establishing . Moore's participation in a conspiracy to rob Sanders did not become less trustworthy because Sanders, rather than the State, sought to introduce it. '
The "interest of justice" factor identiﬁéd in Rule 808(28) dovetails in this case with the *424 right to present a defense. In light of this factor, Richards’s statement fits within the residual hearsay exception even as it pertains to Moore’s future actions. Here the only reasonably available evidence explaining Moore’s alleged unprovoked assault on Sanders was his co-conspirator’s statement that she, Moore, and others “wanted to go beat [Sanders] up to get the money back.” Richards’s statement to Bacod was therefore admissible.
C. Bacod’s Statement To Detective Huelskoetter Was Admissible As Evidence Of Richards’s Statement Under Alaska Rule Of Evidence 804(b)(5).
1. The superior court and court of appeals excluded Bacod’s statement to Detective Huelskoetter based on an overly demanding test for determining sufficient trustworthiness under the unavailable declarant residual hearsay exception.
Alaska Rule of Evidence 804(b)(5) is, like Rule 803(23), a residual hearsay exception. It permits the admission of a statement by an unavailable declarant that would otherwise be éxcluded as hearsay if it has “circumstantial guarantees of trustworthiness” that are “equivalent” to the listed exceptions, and “if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (G) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.” [47]
The superior court stated that Bacod’s statement did not fall within Rule 804(b)(5)’s residual exception because it was not “so trustworthy that adversarial testing would add little to its reliability.” The court of appeals agreed, and quoted the same language in support of its conclusion that the superior court did not abuse its discretion in excluding Bacod’s statement.[48] The quoted standard is from the court of appeals’s decision in Ryan v. State,[49] which in turn was quoting the United States Supreme Court’s decision in Idaho v, Wright.[50]
Both Wright and Ryan áre Confrontation Clause eases1.[51] They were decided based on the precedent established in Ohio v. Roberts, under which even testimonial hearsay could be admissible against a criminal defendant as long as it fell “within a firmly rooted hearsay exception” or bore “particularized guarantees of trustworthiness.”[52] Both cases considered “residual” hearsay evidence offered by the government against a criminal defendant protected by the Confrontation Clause, and both erected a demanding standard for admission: The courts would only allow a criminal defendant to be tried based on the word of a declarant he could not confront if the statement was “so trustworthy that adversarial testing would add little to its reliability.” [53]
*425 In contrast, in this case it was Sanders, rather than the State, who sought to admit Bacod's statement. The State is, of course, not protected by the Confrontation Clauses in the Alaska and United States Constitutions, And the State has not identified any case in which the test the superior court used has been applied to evidence introduced by a criminal defendant. The superior court thus erred by applying the heightened reliability standard that limited the residual hearsay exception in Rule 804(b)(5) to evidence "so trustworthy that adversarial testing would add little to its reliability" to Bacod's statement. Instead, the superior court should have applied the test set out in Evidence Rule 804(b)(5) itself: A statement by an unavailable declarant is admissible if (1) "the statement is offered as evidence of a material fact," (2) "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," (8) "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence," and (4) the statement has "cireamstantial guarantees of trustworthiness" that are "equivalent" to the guarantees of trustworthiness that Justify the enumerated hearsay exceptions when a declarant is unavailable.
Importantly, the enumerated exceptions to which Rule 804(b)(5) refers are those that apply only when the declarant is unavailable. "The traditional exceptions to the hearsay rule form two general classes: (1) those statements which are so inherently reliable that cross-examination is thought unnecessary (Rule 808); and (2) those statements which are sufficiently reliable to be admitted in light of their great evidentiary value when the declarant is unavailable (Rule 804)" [54] The exceptions to which 804(b)(5) refers all have circumstantial guarantees of trustworthiness, such as the unavailable declarant's belief of her impending death [55] or admission to civil or criminal lability,[56] but they are not necessarily "so trustworthy that adversarial testing would add little to [their] reliability." In fact, the limitation of these exceptions to cireumstances in which the declarant is unavailable suggests that eross-examination would add to their reliability, and would be required if it were possible.[57] Thus, the superior court's application of the demanding "adversarial testing would add little" standard to Sanders's efforts to admit Bacod's statement under Rule 804(b)(5) was a legal error.
2, It was legal error for the superior court to refuse to consider evidence that corroborated Bacod's statement to Detective Huelskoetter.
The superior court ruled that "[the trustworthiness of [Bacod's] statement [to Detective Huelskoetter] may not be established by corroborating evidence." - The court of appeals did not specifically consider this claim of error."[58] The superior court's ruling on this point is legal error and is *426 inconsistent with our cases interpreting Evi-denee Rule 804(b)(B).
''The superior court cited Ryan v. State in support of its no-corroborating-evidence rule. As discussed above, Ryan was a Confrontation Clause case. Like the heightened reliability requirement for unavailable declarant hearsay testimony, the requirement that "Itlhe required (guarantees of trustworthi-negs' may not be established by showing that the hearsay statement is corroborated by other evidence". was. based on the court of appeals' interpretation of Idaho v. Wright.[59] The court of appeals in Ryan limited. this holding to cases implicating the Confrontation Clause,[60] The application of the prohibition on corroborating evidence to a eriminal defendant's attempt to introduce hearsay evidence is error,[61] particularly in light of a criminal defendant's constltutlonal right to present a defense. | ®
- In cases that do not feature the specific protections of the Confrontation Clause, extrinsic corroborating evidence often supports the admission of evidence offered under the residual hearsay exceptions in Evidence Rules 804(b)(5) and 808(23).[62] Permitting trial courts to consider extrinsic corroboration appears to be the majority rule in jurisdictions which have specifically addressed the issue.[63] This interpretation makes sense, *427 as a court testing a statement's admissibility under the residual hearsay exceptions is concerned with the trustworthiness of the specific statement at issue, rather than the category of statements to which the statement belongs. There is no logical reason that extrinsic corroborating evidence cannot contribute to creating "civeumstantial guarantees of trustworthiness." [64] Indeed, one of the unavailable declarant hearsay exceptions to which evidence offered under the residual hearsay exeeption is compared contemplates the use of extrinsic evidence to support the hearsay statement,[65] and another, in some *428 cireumstances, requires it."[66] We therefore agree with the majority of jurisdictions that extrinsic corroborating evidence may properly be considered in determining whether a statement proffered under Rule 804(b)(5)'s residual hearsay exception exhibits "ciream-stantial - guarantees of - trustworthiness" equivalent to the other unavailable declarant hearsay exceptions.
3. In light of the correct test of admissibility and the proffered corroborating evidence, Bacod's statement to Detective Huelskoetter should have been admitted.
As discussed above, a statement by an unavailable declarant is admissible if (1) "the statement is offered as evidence of a material fact," (2) "the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," (B) "the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence," and (4) the statement has "cireumstantial guarantees of trustworthiness" that are "equivalent" to the guarantees of trustworthiness that justify the enumerated hearsay exceptions when a declarant is unavailable.[67] The State contests two of these requirements: the circumstantial guarantees of Bacod's statement's trustworthiness and whether the statement is more probative on the point for which it was offered than other evidence Sanders could have reasonably procured.
a. Bacod's statement to Detective Huel-skoetter had the required circumstantial guarantees of trustworthiness.
Whether a particular hearsay statement offered under the residual hearsay exception at Rule 804(b)(5) has sufficient circumstantial guarantees of trustworthiness is necessarily a case-by-case question. Many courts focus upon idiosyncratic aspects of the particular proffered statement which suggest trustworthiness.[68] _ Particularly significant relevant factors relied on by multiple jurisdictions include:
whether the declarant had a motivation to speak truthfully or otherwise; the spontaneity of the statement, including whether it was elicited by leading questions, and generally the time lapse between event and statement; whether the statement was under oath; whether the declarant was subject to cross-examination at the time the statement was made; the relationship between the declarant and the person to whom the statement was made; whether the declarant has recanted or reaffirmed the statement; whether the statement was recorded and particularly whether it was videotaped; and whether the declarant's firsthand knowledge is clearly demonstrat-eq, [69]
And, as discussed above, in cases that do not implicate the Confrontation Clause it is appropriate to consider extrinsic corroborating evidence.
The State correctly notes that the residual hearsay exceptions apply "only on rare occasions," [70] and are not invitations to discard the general prohibition on the admis *429 sion of hearsay. - But in this case at least five factors-Bacod's motivation to speak truthfully, the spontaneity of her statement, the professional relationship between her and Detective Huelskoetter, the fact that her statement was recorded, and the clear demonstration of her firsthand knowledge of Richards's plan-argue in favor of the statement's trustworthiness, as does the extrinsic corroborating evidence. - The particular guarantees of trustworthiness attached to Bacod's statement to Detective Huelskoetter convince us that, given the importance of the statement to Sanders's defense, the statement should have been admitted.[71]
i. Motivation to speak truthfully
Bacod's statement provides no reason to believe she was speaking insincerely in. an effort to help Sanders. She told Detective Huelskoetter that she had known Richards, whom she described as her "best friend," since the third grade, and that she had known Moore for months, She connected her social life to theirs, telling Detective Huelskoetter that she was supposed to have been with Richards,; Moore, Ketzler, and Porterfield on the night of the shooting. In contrast, she explained that she had never met Sanders. Despite this asymmetry of bonds, she relayed information that, whether she knew it or not, would have been helpful to Sanders's defense and implicated her friends in a conspiracy to commit robbery. The fact that Sanders did not learn of the call until the State disclosed its existence fifteen months after Bacod placed it further diminishes the chances that Bacod was somehow lying for Sanders's benefit.
1i. Spontaneity
It is also relevant that Bacod initiated the call to Detective Huelskoetter, The fact that she sought Detective Huelskoetter out rather than vice versa diminishes the chances that she was telling him what she thought he wanted to hear. Bacod answered Detective HMuelskoetter's open-ended questions and stated that she told him everything she knew about the events. She invited him to eall her back if he had any further questions, in the process giving him her full name, home address, and phone number. And she apparently did all of this in the presence of her mother.
The dissent complains that "the most relevant portion" of Bacod's statement "was obtained through the detective's leading questions.[72] But only after Bacod reported what she had learned about the plan from her conversation with Richards [73] did Detective Huelskoetter ask the two follow-up questions cited by the dissent, Both questions were posed immediately after Bacod stated, "I can't think right now," and they are therefore best interpreted not as leading questions but as attempts to elicit clarification of Ba-cod's previous statements.
fil. Under oath
Bacod's statement to Detective Huelskoet-ter was not under oath. But because Bacod was speaking with a peace officer about a crime, knowingly providing false information in this call could have possibly subjected Bacod to criminal liability.[74] This possibility, *430 much like an oath, provided a strong incentive to be truthful.
. iv. Cross-examjination
- Bacod was not subject to cross-examination when she made the statement. Although Detective Huelskoetter asked some clarifying questions, this was no substitute for cross-examination. This factor does not weigh in favor of her statement's admissibility. f
v. Relationship
The fact that Detective Huelskoetter was the police officer charged with investigating the recent shooting deaths of two of her friends strongly favors Bacod's statement's admissibility. Bacod provided the detective background information about what she believed "triggered it to happen." These serious cirenmstances invited careful and somber reflection and explanations. Indeed, as discussed above, knowingly lying to Detective Huelskoetter could have subjected Bacod to criminal Hability.
vi. Recantation and reaffirmation ||
The record does not contain any evidence that Bacod ever recanted or reaffirmed her statement to Detective Huelskoetter, The dissent charges that Bacod "changed her account in real time in response to what she learned" in the interview with Detective Huelskoetter,[75] But Bacod initially indicated, without any prompting from the detective, that Moore, Richards, Ketzler, and Port-erfield wanted to "beat ... up" Sanders. And while Bacod later added that the four of them were going to "try to talk ... it out," the dissent omits Bacod's very. next statement to the detective: "But ... obviously ... they're young, so ... there's gonna be violence in it," And for most of the time between Bacod's statement and her death Sanders was not aware that she had called and spoken with Detective Huelskoetter.
vil. Recording
Detective Huelskoetter recorded Bacod's statement when she called him. If the only record of the statement was Detective Huel-skoetter's recollection and testimony there would be risks that he misunderstood or misremembered the conversation. The fact that the jury could have heard the statement éliminates those risks, although it does not eliminate the risks of Bacod's faulty perception or memory of her conversation with Richards. -
Clear demonstration of firsthand knowledge viii.
Bacod's statement to Detective Huelskoet-ter demonstrated her firsthand knowledge of the plan and conflict Richards described. Bacod listed the number of her friends that went to Sanders's house and provided their names. - She identified the relationships among them. Her close ties with Richards, whom Bacod deseribed as her "best friend," 'and whom Bacod was supposed to join on the night of the shooting, provides further reassurance that Bacod had firsthand knowledge of the conversation with Richards.
ix. Corroboration
Extrinsic corroborating. evidence provides further cireumstantial guarantees of trustworthiness in this case. Bacod correctly identified the group of four people that went to Sanders's home together on the night of the shootings without assistance from Detective Huelskoetter. Bacod stated that "they wanted to go beat [Sanders] up to get the money back," and that because the four were young "there's gonna be violence in it." On the night of the shooting, little more than a week after Bacod reported she spoke with Richards, those four peoplé traveled to Sand-ersg's house with a pistol, a push knife, and a machete. According to Sanders, one of them struck him with the pistol without warning, an action consistent with the plan to "jump" Sanders that Bacod described.
Taken together, the "idiosyneratie factors" [76] surrounding Bacod's statement to
*431 Detective Huelskoetter convinee us that it had the circumstantial guarantees of trustworthiness that Evidence Rule 804(b)(5) requires. Bacod's statement was essential to the defense theories Sanders had a constitutional right to present, and it, 11ke the rest of the Rule 804 exceptions for unavaﬂable de-clarants, was "sufficiently reliable to be admitted in light of [11:5] great evidentiary value.[77]
b. Bacod's statement to Detective Huel-skoetter was more probative on the point for which it was offered than other evidence Sanders could have reasonably procured.
The State also argues that Bacod's statement to Detective Huelskoetter was inadmissible because Porterfield and Ketzler were available to testify, "and both would have presumably known about the purported plan." It follows, the State argues, that the statement Sanders sought 'to introduce was not "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts," as Rule 804(b)(5) requires.[78]
Although it is difficult to precisely define the seope of "the point for which [evidence] is offered," it is clear that Bacod was in a unique position in this, case. She had allegedly learned about an ongoing conspiracy from, a close friend, but she did not join in the enterprise. This gave her crucial insight into the aims of the acting parties without exposing her to the threat of eriminal lability that would normally silence a participant in a criminal scheme. The record contains no hint of another witness prepared to testify that Richards and Moore planned to "Jump" Sanders or of any other person who was aware of the plan but not participating in it. The State acknowledges in its brief that Porterfield, one of the witnesses it faults Sanders for not interviewing, denied knowledge of any plan to rob and beat up Sanders. And the fourth alleged confederate, Ketzler, similarly denied any role in, or knowledge of, a plan to rob Sanders when questioned by police. Moreover, Bacod learned about the plan from Richards, one of the victims and one of the three people whose states of, mind, intentions, and actions were central to the case. >
"Under these cireurnstances, and again informed by Sanders's constitutional right to present a defense, we do not believe that Sanders éould have reasonably procured any evidencé imore probative on 'the points for which Sanders offered Bacod's statement to Detective Huelskoetter. 'We therefore reject the 'State's argument that Bacod's statement was inadmissible for this reason and, in conjunction with our determination above that the statement had the required cfreamstan-tial guarantees of trustworthiness, and the State's well-reasoned concession that admission of the statement would serve the interests of justice, hold that it should hive been admitted under Evidence Rule 804(b)(5).[79]
. D. The Exclusion Of The Two Statements Was Not Harmless.
Although the superior court's exclusion of Richards's statement to Bacod and Bacod's statement to Detective Huelskoetter was erroneous, it is not a basis for reversing Sanders's conviction if the error was harmless.[80] The trial record in this case indicates that the exclusion was not harmless because we cannot "fairly say that the error did not appreciably affect the jury's verdict.[81]
*432 The State argues that the evidence that Richards and Moore had conspired to attack and rob Sanders would not have appreciably affected the jury's verdict because the focus of the State's case was on the excessiveness of Sanders's response, not whether Sanders or Moore was the initial aggressor. The State focuses particularly on the prosecutor's rebuttal argument, during which he appeared to implicitly concede that Moore struck Sand ers first. But the strength of the prosecutor's concession was significantly undercut by its context. Just before those statements, the prosecutor noted that he was arguing based on "words from [Sanders's]! mouth," but he did not tell the jury to accept them as true. Indeed, much of the prosecutor's first closing argument provided the jury with reason not to credit Sanders's account, including Sanders's explanation of what had provoked the shootings. The prosecutor. was hardly. conceding that Sanders was credible when he told the jury that Sanders "tells us for no reason, no reason whatsoever, no reason that he's willing to admit, Mr. Moore whacks him on the head and causes that gash, that gash above his eye, for no reason whatsoever." The prosecutor rhetorically asked the jury, "[Wlould it make any sense for Mr. Moore to whack somebody in the head with an unloaded gun when the other guy's got two loaded guns right there on the bed? That makes no sense." The prosecutor also told the jury that "[wle know intuitively" that Sanders told the other witnesses to the events that "[the story will be he hit me first" And the prosecutor told the jury that Sanders had "a motive to lie to the detectives to make himself look good and to leave out the parts of the story that make it look like ... the shooting of Mr. Moore had a lot more to do with preexisting animosity than we discovered in this case."
In light of the extensive argument against Sanders's account that the State presented during closing argument, we cannot fairly conclude that the exclusion did not have an appreciable effect on the jury's verdict.
v. CONCLUSION
Because the excluded evidence should have been admitted and because its exclusion was not harmless, we REVERSE Sanders's convictions and REMAND for a new trial.
WINFREE, Justice, not participating.

. A push knife is a weapon designed to be grasped so the blade sticks out from the front of the fist. See People v. Owens, 2d Crim. No. B248606, 2014 WL 3667199, at *1 n. 3 (Cal.App. July 24, 2014).

. A transcript of the call follows this opinion as an appendix.

. According to the transcript, Bacod and Detective Huelskoetter were talking over one another during this exchange.

. 899 P.2d 1371, 1375 (Alaska App.1995).

. 497 U.S. 805, 822-24, 110 S.Ct 3139, 111 L.Ed.2d 638 (1990).

. We note the conundrum created by the court's statement that the lack of extrinsic evidence regarding the relationship between Ba-cod, Sanders, and others counted against Ba-cod's statement's admission, given the court's prior conclusion that extrinsic evidence could not be considered when determining the statement's trustworthiness.

. On the first day of trial the State moved for a protective order preventing Sanders from mentioning the push knife and machete during voir dire and his opening statement. The court granted this request because there was no evidence that "the knife" was brandished at Sanders or that he knew of "the knife," and it admonished Sanders's counsel not to mention either weapon in voir dire or his opening argument. The court indicated it would take up the issue later if evidence of either the knife's or machete's relevance developed during the trial,

. Different second-degree murder theories were used for the lesser-included second-degree murder offenses under Counts I and II and the second-degree murder offenses charged directly in Counts III and IV.

. The jury was instructed that justified self-de- * fense was a complete defense to first-degree murder, second-degree murder, and manslaughter If the jury believed Sanders killed Moore in justified self-defense, it would have found Sanders not guilty of all charges related to Moore's death. Instead, the jury found Sanders guilty of the . second-degree murder of Moore under two theories.
The jury also was instructed that heat of passion was a defense to the lesser included second-degree murder theories but not the direct second-degree© murder charges, The jury found Sanders guilty of all second-degree murder of fenses, demonstrating that it did not believe Sanders killed Moore or Richards in the heat of passion.

. See Sanders v. State, Mem, Op. & J, No. 5991, 2013 WL 6229377, at *1 (Alaska App. Nov. 27, 2013). Sanders also argued that the superior court erred by allowing the State to introduce his girlfriend's and his brother's false statements to ' the police: Detective Huelskoetter testified that Sanders's girlfriend said that Sdnders's brother fired a rifle inside the apartment; he also testified that Sanders's brother said that Moore fired at Sanders first. Id. at *1, *5-6. The State labeled both statements "lies" in its closing argument while questioning Sanders's veracity and whether Moore was the first aggressor. The court of appeals concluded that the admission of these statements was error, but was harmless. See id. at *1, *7.

. Id. at "1, "5,

. Id. at *5 (quoting 899 P.2d 1371, 1375 (Alaska App.1995)). '

. Id.

, Id.

. Id.

.

. See id. at *7-10 (Mannheimer, C.J., concurring). M

. - Id. at *8 (emphasis it griginal).

. See id. at "8-10.

. Lee v. Konrad, 337 P.3d 510, 517 (Alaska 2014) (footnote and internal quotation marks omitted). -

. Barton v. N. Slope Borough Sch. Dist., 268 P.3d 346, 350 (Alaska 2012) (quoting City of Bethel v. Peters, 97 P.3d 822, 825 (Alaska 2004)). In contrast, when we review a trial court's decision to admit or exclude evidence solely as an application of a correctly interpreted rule of evidence to the facts of the instant case, we apply the abuse of discretion standard of review. See Greene v. Tinker, 332 P.3d 21, 31, 37-38 (Alaska 2014) (evaluating for abuse of discretion a trial court's decision to admit testimony of late-identified witness).

. Barton, 268 P.3d at 350 (internal quotation marks omitted); see also ConocoPhillips Alaska, Inc. v. Williams Alaska Petroleum, Inc., 322 P.3d 114, 122 (Alaska 2014).

. See Khan v. State, 278 P.3d 893, 896 (Alaska 2012).

. Alaska R. Evid. 801(c).

. See Alaska R. Evid. 802.

. See Alaska R. Evid. 803-04.

. See Alaska R. Evid. 801(d).

. See Alaska R. Evid. 805.

. Sanders v. State, Mem. Op. & J. No. 5991, 38};)WL 6229377, at *5 (Alaska App. Nov. 27,

, Id.

. The State also argues that Richards's statements regarding Sanders's theft of money may not have been based upon her own personal knowledge and thus would be inadmissible under Alaska Rule of Evidence 602, which permits a witness to testify only to matters about which she has personal knowledge. But the statements were being offered to prove Richards's belief that Sanders stole the money as her motive to attack him. Richards had personal knowledge regarding her own belief, just as she had personal knowledge regarding her own plan to beat up Sanders.

. Sanders's stated purpose in requesting admission of Richards's statement of her own motive and intent includes showing "Richards'[s] conduct at Sanders'(s] home"-that "she would have behaved like Moore would have behaved after Sanders fought him off" and in particular that *422 she chose to flee Sanders's home to get to the "getaway car" (instead of "fighting, hiding, staying in place, or withdrawing") and "did nothing to rescue Sanders from his assailant," - Sanders also states that "evidence of Richards'[s] robbery plot would have show[n] that Richards shared Moore's escape route-Porterfield's SUV" and that "Richards ran because she had made the mlstake of bringing a knife to attack a man with a gun.'

. Sanders, 2013 WL 6229377, at "8 (Mannheim-er, C.J., concurrmg) (emphasm in original).

 See AlaskaR Evid. 403

, Cf. Linton v. State, 880 F.2d 123, 130-31 & n. 6 (Alaska App.1994) (affirming introduction of murder victim's hearsay statements, with limiting instruction, under Rule 803(3) even though the statements concerned the victim's fear of the defendant and the defendant's alleged threats to the victim),

. Commentary Alaska E.R. 803(3).

. See Alaska Const. art, 1, § 7.

. Smithart v. State, 988 P.2d 583, 586 (Alaska 1999) (citation omitted),

. See id.

, Valentine v. State, 215 P.3d 319, 326 (Alaska 2009).

. Cf. Keith v. State, 612 P.2d 977, 982-83 (Alaska 1980) ("If the superior court's refusal to admit the journal did, in fact, substantially limit. Keith's opportunities to prove his innocence affirmatively, the due process right to a fair trial would have been denied him.").

. See AS (conspiracy); 11.41.500 (robbery in the first degree).

. Cf. Stewart v. State, 756 P.2d 900, 904-05 (Alaska App.1988) (discussing evidence that corroborated a defendant's connection to a plan described in a co-conspirator's statement).

, - Commentary Alaska E.R. 803(3).

. See Hawley v. State, 614 P.2d 1349, 1357 n. 20 (Alaska 1980); - Commentary - Alaska ER, 801(d)(2) ("[If these rules [-801(d)(2)(C), (D), and (R)-] were written on a clean slate without reference to the Federal Rules, admissions would be treated as exceptions to the hearsay rule and placed under Rule 803.").

. See Mopet Cop® or EvipEnc®, Rule 508 cmt.b (1942) ("[The tendency in the authorities is to receive evidence of all declarations of a conspirator concerning the conspiracy. when made during its pendency. These statements are likely to be true, and are usually made with a realization that they are against the declarant's interest."). .

. Alaska R. Evid. 804(b)(5).

. See Sanders v. State, Mem. Op, & J. No. 5991, 2013 WL 6229377, at *5 (Alaska App. Nov. 27, 2013).

. 899 P.2d 1371, 1375 (Alaska App.1995). .

. 497 U.S. 805, 821, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

. See id. at 808, 110 S.Ct. 3139 ("This case requires us to decide whether the admission at trial of certain hearsay statements made by a child declarant to an examining pediatrician violates a defendant’s rights under the Confrontation Clause of the Sixth Amendment.”); Ryan, 899 P.2d at 1375 ("Because the hearsay issue in this case arises in the context of a criminal prosecution, the hearsay must satisfy not only the requirements of Evidence Rule 804(b) but also the requirements of the Confrontation Clauses of the Federal and Alaska Constitutions (the Sixth Amendment 'to the United States Constitution and Article I, Section 11 of the Alaska Constitution).”).

. 448 U.S. 56, 66, 100 S.Ct. 2531, 65 L.Ed.2d 597(1980).

. Wright, 497 U.S. at 821, 110 S.Ct. 3139; see also Ryan, 899 P.2d at 1375. The United States Supreme Court disapproved the Ohio v. Roberts approach in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which established that "hearsay evidence may violate a defendant’s right of confrontation even though that evidence might be admissible under the hearsay rules.” Clark v. State, 199 P.3d 1203, 1210 (Alaska App. *425 2009). By decoupling the Confrontation Clause and the rules of evidence, Crawford and Davis removed the need to erect a demanding residual hearsay standard to serve the purposes of the Confrontation Clause. Cf. Whorton v. Bockting, 549 U.S. 406, 413-14, 127 S.Ct 1173, 167 L.Ed.2d 1 (2007) ("Roberts potentially excluded too much testimony because it imposed Confrontation Clause restrictions on nontestimonial hearsay not governed by that Clause.").

. In re A.S.W., 834 P.2d 801, 804 (Alaska 1992) (emphasis added).

. See Alaska R. Evid. 804(b)(2).

. See Alaska R. Evid. 804(b)(3).

. See Commentary Alaska ER. 804(b) ("Rule 803 ... is based upon the assumption that a hearsay statement falling within one of its exceptions possesses qualities which justify the conclusion that whether the declarant is available or unavailable is not a relevant factor in determining admissibility. [Rule 804(b)] proceeds upon a different theory: hearsay which admittedly is not equal in quality to testimony of the declarant on the stand may nevertheless be admitted if the declarant is unavailable and if his statement meets a specified standard. The rule expresses preferences: testimony given on the stand in person is preferred over hearsay, and hearsay, if of the specified quality, is preferred over complete loss of the evidence of the declarant").

. See generally Sanders v. State, Mem. Op. & J. No. 5991, 2013 WL 6229377 (Alaska App. Nov. 27, 2013).

. See Ryan v. State, 899 P.2d 1371, 1375 (Alaska App.1995) (citing Idaho v. Wright, 497 U.S. 805, 822-24, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990).

. See id, ('In Idaho v. Wright, the United States Supreme Court held that, at least for Confrontation Clause purposes, a hearsay statement's 'guarantees of trustworthiness' must be "inherent' in the statement." (quoting Wright, 497 U.S. at 822, 110 S.Ct. 3139)).

. See Brumley v. Albert E. Brumley & Sons, Inc., 727 F.3d 574, 578 (6th Cir.2013) ("[Wright's] «requirement that the truthfulness of a statement be so clear [from only the circumstances surrounding the statement] that the test of cross-examination be of marginal utility is specific to the Confrontation Clause; thus, the requlrement is inapplicable in this [civil] case."); United States v. NB; 59 F.3d 771; 776 n. 5 (8th Cir. 1995) . ("Wright has no effect on hearsay analysis when there is no Confrontation Clause issue."); 5 B. Muriirr & Lairp C. Kirxrarrick Frpgrat Evipence § 8:141, at 286-88 (4th ed. 2013) ("Obviously Wright does not.affect use of the catchall [hearsay exception] in civil cases, nor limit defense use of the catchall: in criminal cases, and in these settings independent corroboration continues to count in assessmg trustwor— thiness. ")

, See, eg., Kristen L. v. Benjamin W.; Mem. Op. & J. No. 1502, 2014 WL 2716842, at *3 (Alaska June 11, 2014) (corroborating notes supported admission of counselor's testimony about children's statements under the catchall hearsay exception); In re TP., 838 P.2d 1236, 1241-42 (Alaska 1992) (approving of trial court's admission of minor's hearsay statement under Evidence Rule 804(b)(5) partially because a reference in the statement to the location of an alleged sexual touching was corroborated); cf. Matanuska Elec. Ass'n v. Weissler, 723 P.2d 600, 610 n. 17 (Alaska 1986) (approving of trial court's ruling that the fact that a hearsay "statement also corroborates other testimony" makes it more appropriate to admit under Evidence Rules 804(b)(5) and 803(23)).

. See United States v. Turner, 718 F.3d 226, 233-34 (3d Cir.2013) ("[When determining] whether a document is sufficiently trustworthy to be admitted under ([the residual hearsay exception] ..., the district court may not rely exolu-sively on corroborating evidence." (emphasis added) (citation omitted)); United States v,. Red-lightning, 624 F.3d 1090, 1118 (9th Cir.2010) (concluding that a hearsay statement lacked "circumstantial guarantees of trustworthiness" under residual hearsay exception in part because it was uncorroborated and in part because extrinsic evidence contradicted it); United States v. Hunt, 521 F.3d 636, 643-44 (6th Cir.2008) (finding hearsay statements lacked "circumstantial guarantees of trustworthiness" because they were uncorroborated); United States v. Abreu, 342 F.3d 183, 191 (2d Cir.2003) (finding hearsay statements lacked "circumstantial guarantees of trustworthiness" in part because they were "un- " corroborated"); United States v. Hall, 165 F.3d ©1095, 1110-11 (7th Cir.1999) (stating relevant factor when determining "circumstantial guarantees of trustworthiness" is "whether the declar-ant's statement was insufficiently corroborated"); United States v. Panzardi-Lespier, 918 F.2d 313, 316-17 (ist Cir.1990) (listing corroboration as one factor in determining "circumstantial guarantees 'of trustworthiness" and using extrinsic corroboration, after Wright); State v. Allen, 157 Ariz. 165, 755 P.2d 1153, 1164 (1988) ("We do not require corroboration under the residual hearsay exceptions, but its existence is neverthe«less helpful."); Martin v. State, 346 Ark. 198, 57 S.W.3d 136, 142 (2001) (concluding in .the context of determining "circumstantial guarantees of trustworthiness," that details from the accomplice's post-crime hearsay statements, including "the detailed directions to the abandoned house, the fact that [the victim's] face and mouth had been duct-taped, and the fact that her arms and legs were hogtied[, Iwere Inghly 1nd1cat1ve of the truthfulness of [the] statements.. ."); Cabrera v. *427 State, 840 A.2d 1256, 1268 (Del.2004) ("[The] statements fail to satisfy the ... circumstantial guarantees of trustworthiness [requirement under the residual hearsay exception] for the same reasons that they were not admissible under [the statement against penal interest exception)-they were not supported by sufficient corroborating evidence."); State v. Weaver, 554 N.W.2d 240, , 248 (Iowa 1996), overruled on other grounds by State v. Hallum, 585 NW.2d 249 (Iowa 1998) ("Factors to consider in making a trustworthiness determination under [the residual hearsay « exception] include: .. corroboration...."); People v. Katt, 468 Mich. 272, 662 N.W.2d 12, 24 n. 12 (2003) ("[CJorroborative evidence may be used to determine the trustworthiness of statements [offered under the residual hearsay exceptions], ... [if] the Confrontation Clause is not implicated." (emphasis omitted) (citations omitted)); State v. Griffin, 834 N.W.2d 688, 693 (Minn.2013) (listing corroborating evidence as a relevant factor for determining "circumstantial guarantees of trustworthiness" under a residual hearsay exception); State v. Coftier, 755 N.W.2d 120, 131 (8.D.2008) ("[Flactors for a trial court to consider in assessing trustworthiness of hearsay offered under the residual hearsay rule ... include: ... the existence of corroborating evidence...."); State v. Lopez, 353 Wis.2d 1, 843 N.W.2d 390, 437 (2014) (stating that factors to consider in determining "circumstantial guarantees of trustworthiness" under a residual hearsay exception include "the existence of other corroborating evidence"); Lafond v. State, 89 P.3d 324, 339 (Wyo.2004) ("[Clircumstantial guarantees of trustworthiness may be established through other corroborating evidence...." (quoting Johnson v. State, 930 P.2d 358, 366 (Wyo.1996))); 2 Grorar E. Dix ar a., McCormick on Evipence § 324, at 565-66 (Kenneth S. Broun ed., 7th ed. 2013) ("[EJven before Crawford v. Washington eliminated the precedential value of Wright, some lower courts used corroboration as a factor establishing trustworthiness of hearsay admitted under a catchall exception when the confrontation issue was otherwise eliminated."); 5 Frperat Evipencr, supra note 61, § 8:141, at 286-88; - Hearsay - HawnpBoox §§ 47:1-2 ed.2014); 5 Jack B. & Marcarmr A. Bercer, WaemstEem's FEperat EvipeNCE § 807.03[2][bl, at 807-15 to -18 (Joseph M. McLaughlin ed., 2d ed.2014). (4th
But see United States v. El-Mezain, 664 F.3d 467, 498 (5th Cir.2011) ("'The determination of trustworthiness is 'drawn from the totality of the circumstances surrounding the making of the statement, but it cannot stem from other corroborating evidence." [United States v.] Ismoila, 100 F.3d [380,] 393 [ (5th Cir.1996) ] (Citing Idaho v. Wright, 497 U.S. 805, 820-22, 110 S.Ct. 3139, 111 LEd.2d 638 (1990))."); Vasquez v. People, 173 P.3d 1099, 1106-07 (Colo.2007) (relying upon Wright to conclude that extrinsic corroboration is not appropriate consideration when determining , "circumstantial guarantees of trust worthiness" under residual hearsay exception); State v. Aaron L., 272 Conn. 798, 865 A.2d 1135, 1144 n. 20 (2005) ("Only factors related to the circumstances surrounding the making of the challenged statement may be considered to support the reliability. of the hearsay statement at issue." (emphasis in original)); Larchick v. Diocese of Great Falls-Billings, 350 Mont. 538, 208 P.3d 836, 845 (2009) ("[The residual hearsay exception] logks to the circumstances surrounding a hearsay statement when it is made-the circumstantial guarantees of trustworthiness that lend reliability to the hearsay statement in lien of cross-examination." . (internal quotation mark omitted)); State v. Johnson, 210 W.Va. 404, 557 S.E.2d 811, 817 (2001) (Reliability must be shown from the circumstances surrounding the making of the statement.").

. The State argues that the word "circumstantial" in "equivalent circumstantial guarantees of trustworthiness" means only the fmmediate circumstances of the statement, not any extrinsic corroborating circumstances. . But the word "circumstantial" could just as easily include any circumstances indicating trustworthiness, including extrinsic corroboration. The wording of Rule 804(b)(5) does not exclude the consideration of extrinsic evidence, and we will not read such a prohibition into the rule. See State v. Robinson, 718 N.W.2d 400, 409 n. 4 (Minn.2006) ("Nor does the residual exception itself prevent us from considering corroborating evidence. The rule contains no specific limitation...."}.
The State additionally argues that the presence of extrinsic corroboration precludes the state«ment from being "more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." Though it is possible that extrinsic corroborating evidence could be more probative than the hearsay statement it supports, this will not always be the case.

. - See Alaska R. Evid. 804(b)(4)(B) (exception for statement of personal or family history about a person other than the unavailable declarant "if the declarant was related to the other by blood, adoption, or marriage or was so intimately asso- *428 clated with the other's family as to be likely to have accurate information concerning the matter declared").

. See Alaska R. Evid. 804(b)(3) (Although statements against interest are generally admissible, "[a) statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."). The State argues that Rule 804(b)(3)'s explicit inclusion of corroborating evidence means that the drafters of the rules intended to disallow the use of corroborating evidence for the other hearsay exceptions, including Rule 804(b)(5). But the requirement of corroboration in one area does not necessarily entail its prohibition in another. The drafters of Rule 804(b)(5) could have stated that no extrinsic corroboration could be used to find "equivalent circumstantial guarantees of trustworthiness," but they did not.

. Alaska R. Evid. 804(b)(5). The Rule also requires adequate notice to the opposing party, a requirement not at issue in this case.

. See McCormick on Evipencr, supra note 63, § 324, at 561-66.

. Id.

. | In re A.S.W., 834 P.2d 801, 804 (Alaska 1992).

. See id. (explaining that the unavailable declar-ant hearsay exceptions in Rule 804 relate to "statements which are sufficiently reliable to be admitted in light of their great evidentiary value"); see also Smithart v. State, 988 P.2d 583, 586 (Alaska 1999) (recognizing that exclusion of evidence proffered by a criminal defendant can violate the defendant's due process rights).

. Dissent at 433.

. "(Sanders) stole money from one of our friends, and they wanted to go beat him up to get the money back...." Bacod then stated, "Ashlee [Richards], Raven [Ketzler], Travis [Moore], and Travis's fiancée Sherrell [Porter-field] ... woke up with money gone, and they were guessing it was [Sanders]. ..."

. See AS 11,56.800(a)(1)(A) ("A person commits the crime of false information or report if the person knowingly gives false information to a peace officer with the intent of implicating an- * other in an offense."). The State argues that Bacod could not have faced charges for false information or report because "'it was Richards who supposedly suggested that others intended to commit a crime," while "Bacod was merely a conduit for that information." But this section applies as readily to "conduits" as to primary sources, so long as the requisite knowledge and intent are present. *

. Dissent at 433.

. McCormick on Evipence, supra note 63, § 324, at 561.

. In re A.S.W., 834 P.2d 801, 804 (Alaska 1992).

. The State also alludes to the availability of Sanders's brother, Joseph, to testify that Moore attacked Sanders first, but Bacod's statement was probative of more than just Moore's physical actions in Sanders's bedroom and came from a source much less likely to fabricate testimony on Sanders's behalf,

. In its respondent's brief, the State clarified that "[the state does not dispute the potential materiality of the report by Bacod-it refers to the purported statements by Richards, which if admissible, would be relevant. Nor does the state dispute that admission of Bacod's report would be consistent with the evidence rules and the interests of justice. The state, however, disputes that Bacod's report is more probative than other reasonably available evidence."

. See Alaska R.Crim. P. 47(a) ("Any error, defect, irregularity or variance which does not af-. fect substantial rights shall be disregarded.").

. - Love v. State, 457 P.2d 622, 634 (Alaska 1969). Sanders argues that, given the constitutional nature of his claim of error, the State is required to demonstrate that the error was harmless beyond a reasonable doubt. See, eg., Adams v. State, 261 P.3d 758, 773 (Alaska 2011) ("A constitutional violation will always affect substantial rights and will be prejudicial unless the State proves that it was harmless beyond a reasonable doubt. An error that is not constitutional in nature will be prejudicial if the defendant proves that there is a reasonable probability that it affected the outcome of the proceeding."). Because we find that the error was not harmless under the less-demanding standard for non-constitutional errors, we need not determine whether the error was harmless beyond a reasonable doubt.